**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| **LIGTEL COMMUNICATIONS, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 1:20-cv-00037-HAB-SLC** |
| **BAICELLS TECHNOLOGIES INC.;** **BAICELLS TECHNOLOGIES NORTH** **AMERICA INC.,** | |
| **Defendants.** | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO LIGTEL'S MOTION FOR A PRELIMINARY INJUNCTION

Defendants Baicells Technologies Inc. and Baicells Technologies North America Inc. ("Baicells"), by counsel, hereby submit this opposition to LigTel's Motion for a Preliminary Injunction (the "Motion").[1]  As explained further below, LigTel has failed to show that its claims have any likelihood of success on the merits, or that it will suffer irreparable harm if an injunction is not granted.  Indeed, LigTel has failed to show that it has suffered or will suffer any harm at all, and it has an adequate remedy at law.  In addition, the balance of harms in this case weighs heavily in favor of Baicells.  For all of these reasons, LigTel's Motion should be denied.

## BACKGROUND

Baicells is a company that manufactures and sells Long-Term Evolution ("LTE") wireless broadband equipment to operators of wireless networks.[2]  (Decl. of Jesse Raasch ("Raasch Decl.") ¶ 5.)  Baicells is not an operator of commercial wireless networks, and Baicells does not provide internet services or mobile phone services to its customers.  (Id. ¶ 6.)

---

[1] LigTel's Motion is ECF No. 4, and its supporting memorandum of law ("LigTel Mem.") is ECF No. 5.
[2] LTE is a telecommunications standard used for high-speed data transfer over cellular networks.  (Raasch Decl. ¶ 5.)

LigTel, on the other hand, is a commercial wireless network operator.  Indeed, by its own description, LigTel "provides broadband internet, television, and wireless telephone service in seven counties in northeastern Indiana," and "has approximately 1,500 wireless service customers in northeastern Indiana."  (Ex. A, Plaintiff's Supplemental Objections and Responses to Defendants' First Set of Interrogatories ("LigTel Interrogatory Responses"), at 4).[3]

In short, Baicells and LigTel are not competitors.  Baicells provides wireless network equipment to network operators, whereas LigTel is a network operator providing wireless services to end users.  (Raasch Decl. ¶ 8).  They provide entirely different types of goods and services to wholly distinct categories of customers.  (*Id.*)

This dispute arose from events that took place more than eight months ago and involves the use of a Home Network Identity ("HNI") or Public Land Mobile Land Network ("PLMN") code.  An HNI or PLMN code consists of a three-digit Mobile Country Code ("MCC") and either a two-digit or three-digit Mobile Network Code ("MNC").  Together, the MCC and MNC make up the HNI/PLMN code, which may consist of either five or six digits.  (Raasch Decl. ¶ 10.)  An HNI Code combines with a Mobile Subscription Identification Number ("MSIN") to form an international mobile subscriber identity ("IMSI") number, which is part of the apparatus used to identify and authenticate wireless-network subscribers on end-users' devices.  (Raasch Decl. ¶ 16.)

Since approximately November 2015, Baicells has used the five-digit HNI code 31198.  Around that time, research and development engineers began using this code to test certain Baicells equipment, after determining that the full list of assigned HNI codes in the United States contained no five-digit numbers.  (Raasch Decl. ¶ 12.)  Baicells later began using the HNI code

---

[3] All references to "Ex. __" herein are references to exhibits to the Declaration of Jessa DeGroote, which is being filed herewith, unless indicated otherwise.

31198 outside the lab testing environment in approximately mid-2016, when a Baicells customer first tested prototype Baicells equipment.   (Ex. B, Defendants' Answers and Objections to LigTel's First Set of Interrogatories ("Baicells Interrogatory Responses"), at 3.)

For more than three years, Baicells used the HNI code 31198 without incident.  However, that changed in early July 2019, when a Baicells customer in Nebraska notified Baicells that the customer had received a cease-and-desist letter from an attorney representing LigTel.  (Harnish Decl. ¶¶ 7-9.)  LigTel had informed the Baicells customer that another company—a provider of mobile cellular service to residents and businesses in Colorado and nearby states—claimed it was receiving spectrum interference in a shared spectrum band, and the provider had mistakenly attributed the interference to LigTel based on LigTel's registered HNI Code of 311-980.  (*Id.*)  It is important to note that the interference itself was <u>not</u> caused by Baicells' HNI code or any inherent feature of Baicells' equipment.  Rather, the interference was caused by the fact that the two operators were operating in the same radio frequency.

Shortly after learning of this issue, on July 22, 2019, Baicells filed an application to obtain a new PLMN/HNI code with iConectiv and the Alliance for Telecommunications Industry Solutions ("ATIS"), and the IMSI Oversight Council ("IOC").  (Decl. of Rick Harnish ("Harnish Decl.") ¶ 12.).  iConectiv is the United States IMSI Administrator which administers the HNI codes on behalf of the United States Department of State, and the IOC is a committee of ATIS that oversees the performance of the IMSI administration.   (*Id.*)   On July 29, 2019, iConectiv/ATIS assigned HNI code 314-030 to Baicells.  (*Id*. ¶ 13.)

That same day, Baicells representatives—including Rick Harnish (Chief Marketing Officer), Ronald Mao (Director of Carrier Solutions), and Bo Wei (President and CEO)—met with LigTel to discuss LigTel's concerns regarding Baicells' use of HNI code 31198.

3

(Declaration of Bo Wei ("Wei Decl.") ¶ 6.)   LigTel representatives at the meeting included Randy Mead (Chief Executive Officer and General Manager), Josh Wentworth (Network Operations Supervisor), and Mike Troup (Network Operations Manager and Marketing).   (*Id.* ¶ 7.)   In addition, without any prior notice to Baicells, LigTel's outside counsel attended and largely directed the meeting.   (*Id.* ¶¶ 8-9.)   Baicells was not represented by counsel at the meeting, and was surprised by the presence of LigTel's lawyers.   (*Id.* ¶¶ 6, 8.)

At the July 29, 2019 meeting, LigTel demanded that Baicells either pay LigTel $1,000,000 for LigTel to transfer its HNI code to Baicells, or that Baicells obtain and transfer to a new HNI code.   (*Id.* ¶ 14.)   Baicells did not commit to either course of action at the meeting. (*Id.* ¶ 19.)   However, following the meeting and after additional internal deliberations, Baicells decided to transition to the new HNI code that it had been assigned, 314-030, and Baicells began developing a plan to carry out that transition.   (Harnish Decl. ¶ 26.)

In August 2019, Baicells began participating in communications and meetings with the IOC regarding Baicells' plan to migrate to HNI Code 314-030.   (*Id.* ¶ 27.)   On September 12, 2019, Baicells submitted the Baicells PLMN Migration Plan to IOC, and at subsequent IOC meetings in September and November 2019, the IOC agreed to the Baicells PLMN Migration Plan.   (*Id.* ¶¶ 28-31.)   As part of this process, Baicells informed the IOC that it planned to complete its transition to the HNI Code 314-030 by July 2020.   ( *Id.*)   LigTel participated in some IOC meetings and also submitted comments to the IOC on the Baicells PLMN Migration Plan.   (Wei Decl. ¶¶ 25-26; Harnish Decl. ¶ 30.)

Baicells has provided periodic migration status reports to the IOC over the last several months, including its most recent status report on March 18, 2020.   (Harnish Decl. ¶¶ 31-36.) Baicells remains on target to reach its goal of migrating its customers to the new HNI code by

July 2020.  (*Id.* ¶ 36.)  Indeed, on March 18, 2020, Baicells announced on the Baicells Website Community Forum and Facebook Operator Support Group that it would be retiring the five-digit HNI code 31198 and replacing it with the new HNI Code 314-030, effective July 1, 2020.  (*Id.* ¶ 41 & Exhibit 11 thereto.)

Once the Baicells migration is complete, all network operators who are Baicells customers will broadcast the HNI Code 314-030.  (*Id.* ¶ 42.)  Thus, there will be no risk of any confusion among network operators related to spectrum interference like the single incident that took place more than eight months ago and caused LigTel to realize, after some three years of use, that Baicells was using the HNI code of 31198.  (*Id.* ¶¶ 42-43.)

## LEGAL STANDARD

As an "equitable, interlocutory form of relief," a preliminary injunction "is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it."  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (citation omitted).  To determine whether this extraordinary remedy is warranted, a district court engages in a two-phase analysis—a threshold phase and a balancing-of-harms phase.  *Id.* at 1085-86.

At the threshold phase, the moving party must satisfy three requirements.  The moving party has the burden to establish that:  (1) its claims have some likelihood of success on the merits, (2) absent a preliminary injunction, it will suffer irreparable harm prior to a final resolution of its claims, and (3) there is no adequate remedy at law.  *Id.* at 1086; *see also Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992).  If the moving party fails to satisfy any one of these three requirements, then the court must deny the preliminary injunction.  *Girl Scouts*, 549 F.3d at 1086 (citing *Abbott Labs.*, 971 F.2d at 11).

If the moving party survives the threshold phase, then in the second phase, the court "attempt[s] to minimize the cost of potential error" by balancing "the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the public interest." *Girl Scouts*, 549 F.3d at 1086 (internal quotation marks and citation omitted). In performing this balancing-of-harms analysis, the court "weighs the irreparable harm that the moving party would endure" absent the preliminary injunction "against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* This involves a sliding-scale approach—the less likely the plaintiff is to win, the more heavily the balance of harms must weigh in the plaintiff's favor for the preliminary injunction to be granted, and vice versa. *See id.* (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)).

## ARGUMENT

### I. LigTel does not pass the threshold test for a preliminary injunction because its claims cannot succeed on the merits.

In order to survive the threshold phase of the preliminary injunction test, LigTel must first demonstrate that its claims have some likelihood of success on the merits. LigTel cannot do so, and therefore, its Motion should be denied.

### A. LigTel's Lanham Act claims and common-law unfair competition claim are wholly without merit.

The first two counts of LigTel's Complaint (the "Lanham Act Claims") are brought pursuant to Section 43(a) of the Lanham Act, which is codified at 15 U.S.C. § 1125(a). That section prohibits, in relevant part, the use in commerce of "any false designation of origin" or any "false or misleading representation of fact" which "is likely to cause confusion, or to cause mistake, or to deceive as to . . . the origin, sponsorship, or approval" of goods or services.

15 U.S.C. § 1125(a)(1)(A).  Pursuant to this subsection, LigTel has pleaded separate counts for "False Designation of Origin" and "False or Misleading Representation."

The Lanham Act Claims cannot succeed on the merits for at least three reasons.  First, Baicells does not use and has never used LigTel's HNI Code, and thus has made no false or misleading statement or designation of origin.  Second, Baicells' use of the HNI code 31198 has not caused, and will never cause, any consumer confusion regarding the origin of goods or services.  Third, LigTel's HNI Code is not a protectable mark under the Lanham Act.

While any one the foregoing deficiencies is sufficient to show that LigTel has no likelihood of success on the merits of its Lanham Act Claims, these claims suffer from all three deficiencies.

1.   <u>Baicells does not use and has never used LigTel's HNI Code.</u>

As a threshold matter, the Lanham Act Claims are without merit because Baicells does not use, and has never used, LigTel's HNI Code.  Thus, Baicells has never made a false designation of origin, or a false or misleading representation of fact, as required for a claim under Section 1125(a)(1)(A).

It is undisputed that LigTel has never registered or used the five-digit HNI Code 31198.  Rather, LigTel's HNI Code is the six-digit code 311-980.  (*See* Ex. A, LigTel Interrogatory Responses at 3; Ex. B, Baicells Interrogatory Responses at 4.)

Moreover, Baicells has never adopted, implemented, used, encouraged, instructed, or directed third parties to adopt, implement, or use LigTel's HNI Code of 311-980.  Rather, Baicells has historically used the HNI code 31198.  (*See* Ex. B, Baicells Interrogatory Responses at 4; Raasch Decl. ¶ 11.)

In short, Baicells has never made any false designation of origin, nor has it made any false or misleading representation of fact that would support a claim under Section 1125(a)(1)(A).  Rather, Baicells has used a five-digit HNI code that is separate and distinct from LigTel's HNI Code.  LigTel's Lanham Act Claims fail for this reason alone.

        2.  <u>Baicells' use of the HNI code 31198 has not caused, and will not cause, consumer confusion.</u>

LigTel's Lanham Act Claims also fail on the merits because LigTel has not shown, and cannot show, that Baicells' use of the HNI code 31198 has ever caused, or is likely to cause, confusion among consumers regarding the source of goods or services.

To prevail on a claim under Section 1125(a), LigTel is required to prove "that the defendant's use of [the] mark is likely to cause confusion among consumers." *Phoenix Entm't Partners v. Rumsey*, 829 F.3d 817, 822 (7th Cir. 2016).  In addition, the "consumer's confusion must be confusion <u>as to the source</u>" of goods or services.  *Id.* at 829 (emphasis added) (citing *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 701 (7th Cir. 2014)).

The consumer-confusion requirement furthers the purpose of the Lanham Act, which is to foster fair competition by "protecting <u>source-identifying</u> marks, and proscribing the deceptive and misleading use" of such marks.  *Rumsey*, 829 F.3d at 825 (emphasis added and internal quotation marks and citation omitted).  By protecting source-identifying marks, the Lanham Act (1) "simplifies consumer choice, by enabling consumers to rely on a mark that readily identifies a particular brand and producer," and (2) "assures the producer of a particular good that it, and not an imitating competitor, will reap the financial rewards of the good's (or the brand's) reputation."  *Id.* (citing *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003)).

As a threshold matter, HNI codes do not serve as source-identifying marks for consumers. Rather, an HNI code is a five-digit or six-digit code that is embedded within a longer IMSI number that is stored on a subscriber identification module ("SIM") card—an integrated circuit that securely stores the IMSI number and its related key—on an end-user device, such as a mobile phone or computer. (Raasch Decl. ¶¶ 10, 16-17.) The IMSI number and related key serve to identify and authenticate subscribers on end users' devices. (*Id.*)

For the ordinary end-user consumer, the HNI code has no visibility or significance. It is buried within the hardware and software that is used to identify and authenticate users to wireless networks, and is not transparent to the end user. (Raasch Decl. ¶¶ 21-22.) Accordingly, an HNI code does not serve as a source-identifying mark—like a brand name or logo—for consumers.

Thus, it is unsurprising that LigTel has failed to identify even a single instance of <u>consumer</u> confusion arising from Baicells' use of the HNI code 31198. The lone instance of "confusion" identified by LigTel did not involve consumers at all. Rather, it involved an incident of spectrum interference between wireless network operators located in Nebraska and Colorado. (*See* Compl. ¶ 6; Harnish Decl. ¶¶ 7-9.) And even though that incident did not involve <u>consumer</u> confusion, LigTel has not identified a single additional instance of such confusion since the incident in June 2019. (Ex. A, LigTel Interrogatory Responses at 7-9 (Answer to Interrogatory No. 5).)

Likewise, LigTel has been unable to identify any way in which <u>consumers</u> associate or identify LigTel's HNI Code with LigTel as a source of goods or services. (*See* Ex. A, LigTel Interrogatory Responses at 4-6 (Answer to Interrogatory No. 6).) Rather, when asked to do so, LigTel offered only that its HNI Code (i) "allows other <u>providers</u> to identify LigTel as the source of an interfering signal," (ii) is found on SIM cards which are "used to identify and authenticate

subscribers to LigTel's network," and (iii) may be used by law enforcement officials "to identify a suspect's or target's cellular service provider."   (*See id.* (emphasis added).)   Conspicuously absent from this list is any information regarding how consumers regard LigTel's HNI Code as a source-identifying mark—and that is because they simply do not.

Nor was LigTel able to identify any advertising or promotional materials in which it uses its HNI Code as a way to identify its goods or services.   (*See* Ex. A, LigTel Interrogatory Answers at 6-7 (Answer to Interrogatory No. 4).)

In short, LigTel cannot show that Baicells' use of the HNI Code 31198 is likely to cause consumer confusion—indeed, after more than three years of use, it never has.   For this additional reason, LigTel's Lanham Act Claims have no likelihood of success on the merits.

### 3.   LigTel's HNI Code is not a protectable mark.

To prevail on its Lanham Act Claims, LigTel also "must be able to show . . . that its mark is protectable."   *Rumsey*, 829 F.3d at 822; *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (The "general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under [15 U.S.C. § 1125(a)].").

LigTel cannot meet the protectability requirement for two reasons.   First, LigTel does not use the HNI Code "in commerce" within the meaning of the Lanham Act.   Second, LigTel does not use the HNI Code in a manner than enables the consuming public to identify LigTel as the source of goods or services.

To show that an unregistered mark is protectable, a plaintiff must show "use in commerce" of the relevant mark.   15 U.S.C. § 1127; *see also Aaron MacGregor & Assocs., LLC v. Zhejiang Jinfei Kaida Wheels Co.*, 328 F. Supp. 3d 906, 923 (N.D. Ind. 2018).   The "use in

10

commerce" requirement is satisfied when the mark "is [i] used or displayed in the sale or advertising of services <u>and</u> [ii] the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services."  15 U.S.C. § 1127 (emphasis added); *see also Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1360 (Fed. Cir. 2009) (explaining that a service mark "can only meet the use requirement if (1) [the] mark was 'used or displayed in the sale or advertising of services,' <u>and</u> (2) [the] service was either 'rendered in commerce' or rendered in more than one state or in this and a foreign country by a person engaged in commerce" (quoting 15 U.S.C. § 1127) (emphasis in *Aycock*)).

LigTel cannot satisfy the "use in commerce" requirement, because it neither uses nor displays its HNI code in the sale or advertising of services.  *See Vision Ctr. Nw., Inc. v. Vision Value,* LLC, 673 F. Supp. 2d 679, 686 (N.D. Ind. 2009) ("use in commerce" requires that a mark "is used or displayed in the sale or advertising of services").  This means that LigTel's HNI Code is not protectable, and this is fatal to LigTel's Lanham Act Claims.  *See Couture v. Playdom, Inc.*, 778 F.3d 1379, 1381 (Fed. Cir. 2015) (explaining that "a mark for services is used in commerce only when . . . 'it is used or displayed in the sale or advertising of services'" (quoting 15 U.S.C. § 1127)).

Baicells specifically asked LigTel in an interrogatory to "[i]dentify and describe the nature of any advertisements, promotional materials, and/or marketing material . . . in which LigTel is using, has used, or plans to use the LigTel HNI Code."  (Ex. A, LigTel Interrogatory Responses at 6-7 (Answer to Interrogatory No. 4).)  LigTel's answer identified <u>no</u> advertising, promotional, or marketing material in which LigTel uses or displays its HNI Code, but instead stated that "LigTel advertises, promotes, and markets its wireless services, which use LigTel's

HNI Code, through websites, print, and other media, within the seven counties in northeastern Indiana that LigTel currently serves." (*Id*.)  But the mere fact that LigTel advertises its wireless services, which happen to use LigTel's HNI Code, is wholly insufficient to demonstrate or even suggest that LigTel uses the HNI Code to advertise or promote LigTel's services.

In short, because LigTel fails to meet the "use in commerce" requirement, the LigTel HNI Code is not protectable, and LigTel's Lanham Act claims fail on the merits.

Moreover, even if LigTel were able to satisfy the "use in commerce" requirement, LigTel's HNI Code still would not be protectable because LigTel does not use the HNI code "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 433–34 (7th Cir. 1999) (internal quotations and alterations omitted)); *see also* 15 U.S.C. § 1127 (defining service mark as a word, name, symbol, or device that is used to "identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services").

As explained in Section I.A.2, *supra*, LigTel cannot demonstrate that consumers recognize the HNI code of 311-980 as a source-identifying mark for LigTel.  Thus, LigTel cannot demonstrate its HNI Code is protectable under the Lanham Act.  *See In re DSM Pharm., Inc.*, 87 U.S.P.Q.2d 1623, 2008 WL 2385957, at *1 (T.T.A.B. June 4, 2008) (explaining that, in order for a service mark to be protectable, the party seeking protection "must show use of the mark in a manner that would be perceived by potential purchasers as identifying the [party]'s services and indicating their source via a 'direct association'").

4. LigTel's common-law unfair competition claim fails for the same reasons.

LigTel also brings an unfair competition claim under Indiana common law. (Compl. ¶¶ 65-73.) As recognized by LigTel in paragraph 66 of its Complaint, however, it is well-established that "[a] court should analyze an Indiana common law action for unfair competition in the same manner as a Lanham Act claim." *Woodard v. Jackson*, 2004 WL 771244, at *9 (S.D. Ind. Mar. 25, 2004); *see also Fortres Grand Corp.* 763 F.3d at 700 n.4. This includes the "use in commerce" element discussed above, which is "also essential in the analysis of [LigTel]'s . . . unfair competition claims." *Aaron MacGregor & Assocs., LLC v. Zhejiang Jinfei Kaida Wheels Co.*, 328 F. Supp. 3d 906, 923 (N.D. Ind. 2018). Accordingly, LigTel's common-law unfair competition claim fails on the same basis as its Lanham Act Claims.

**B.     LigTel's trade-secrets claims are also wholly without merit.**

LigTel's remaining claims are for trade secret misappropriation, or threatened misappropriation, under the federal Defense of Trade Secrets Act and the Indiana Uniform Trade Secrets Act. (*See* Compl. ¶¶ 74-93.) These claims are also wholly without merit. Baicells does not possess, and has never possessed, any of LigTel's trade secrets. Nor has Baicells ever misappropriated or threatened to misappropriate any of LigTel's trade secrets, which it does not even possess. Accordingly, LigTel has no likelihood of success on its trade-secrets claims.

"Both the federal Defend Trade Secrets Act ("DTSA") and the Indiana Uniform Trade Secrets Act ("IUTSA") predicate liability on an act of misappropriation." *Howmedica Osteonics Corp. v. DJO Glob., Inc.*, 2018 WL 3130969, at *7 (S.D. Ind. Mar. 15, 2018) (citing 18 U.S.C. § 1836; Ind. Code § 24-2-3-4(a)). To prevail on a trade secret claim under either statute, "a plaintiff must therefore make a threshold showing that the information they seek to protect constitutes a 'trade secret,' and they must then establish either actual or threatened

misappropriation." *AL-KO Axis, Inc. v. Revelino*, 2013 WL 12309288, at *14 (N.D. Ind. Oct. 25, 2013).   Misappropriation occurs where there is "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 920 (N.D. Ill. 2016); *see also* 18 U.S.C. § 1839(5); Ind. Code § 24-2-3-2.

Here, LigTel's trade-secrets claims necessarily fail because there can be no "unconsented disclosure or use" of any trade secret—which LigTel fails to adequately identify or define—that Baicells does not possess.

LigTel's trade-secrets claims are premised on the vigorously disputed allegation that, during the July 29. 2019, meeting between LigTel and Baicells, Wei and Mead had a sidebar conversation in which Wei allegedly "proposed that he could have [Ronald] Mao 'get into' LigTel's core and reprogram it for free, without informing Huawei." (Compl. ¶ 41; Decl. of Randy Mead (ECF No. 5-1) ¶ 13.)   While Wei confirms that he had a private sidebar conversation with Mead, Wei has categorically denied Mead's allegation of the proposal involving Mao as "patently false."  (Wei Decl. ¶ 18 ("I have never said or intimated any such thing, to Mead or to anyone else.").)

Nevertheless, LigTel's trade-secrets claims are further premised on Mead's speculative "interpret[ation] [of] Wei's offer as implying that Mao could do the work on LigTel's core without providing him with proprietary trade secret information—such as the network design or encryption code."  (Compl. ¶ 41; Mead Decl. ¶ 14)   This wholly speculative assertion is

unsupported by the evidence, which demonstrates that Mao never had any access to any LigTel trade secrets during his prior employment with Huawei Technologies USA ("Huawei").

Mao was employed by Huawei as a product manager from November 2005 until June 2017.  (Mao Decl. ¶ 11.)  During the 2015-16 timeframe, Mao was assigned to serve LigTel in a sales support role—the same role that he served for many other accounts.  (*Id.* ¶ 12.)  By the time Mao began working with LigTel, LigTel had already purchased and installed certain equipment from Huawei, and Mao was not involved in the design, configuration, sales, or installation of any of that equipment.  (*Id.* ¶ 13.)  During his employment with Huawei, Mao never visited any of LigTel's facilities or locations, and his role was limited to occasional communications with LigTel that he considered to be a "maintenance mode."  (*Id.* ¶¶ 14, 16.)  Mao never sold any equipment to LigTel.  (*Id.* ¶ 16.)

Although Mao had some general knowledge of LigTel's tower locations, radio frequency information, and wireless coverage areas—publicly available information that does not constitute a trade secret, and in any event is not alleged to be at issue by LigTel—he never had access to LigTel's encryption code, IP infrastructure (either physical or logical), software, or systems. (Mao Decl. ¶¶ 17-18, 22.)  And when Mao left his employment with Huawei in June 2017, he left his laptop computer and all work-related documents and information with Huawei, and did not retain copies of such documents and information.  (Mao Decl. ¶ 20.)

Likewise, Baicells' decision to hire Mao in December 2017 had nothing to do with LigTel.  (Raasch Decl. ¶¶ 35-39.)  Indeed, as explained *supra*, Baicells and LigTel are not competitors, and Baicells' adoption of the HNI code 31198 preceded Mao's hiring by more than two years.

In short, Baicells does not possess, and has never possessed, any trade secrets belonging to LigTel.  LigTel has offered no evidence to the contrary, nor has it offered any rational explanation for why Baicells—which does not compete with Baicells and serves an entirely distinct category of customers—would be interested in any alleged trade secrets that LigTel may possess.  For this reason alone, LigTel's trade-secrets claims also have no likelihood of success on the merits.

## II. LigTel does not pass the threshold test for a preliminary injunction because it faces no threat of irreparable harm and has an adequate remedy at law.

In order to survive the threshold phase of the two-phase test for a preliminary injunction, LigTel must also "demonstrate that [it] will likely suffer irreparable harm absent obtaining preliminary injunctive relief" and that it lacks an adequate remedy at law.  *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017).  LigTel cannot demonstrate that it is likely to suffer irreparable harm, and LigTel has an adequate remedy at law.  Accordingly, LigTel's Motion should be denied.

### A. LigTel cannot show that it will likely suffer irreparable harm absent injunctive relief.

LigTel has failed to demonstrate that, absent a preliminary injunction, it will suffer irreparable harm.  While LigTel is "require[d] [to show] more than a mere possibility of harm," *Whitaker*, 858 F.3d at 1044-45, LigTel has offered only speculation regarding various ways that it could be harmed.  (*See* LigTel Mem. at 9.)  Moreover, LigTel has failed to identify even a single additional incident of "confusion" among network operators in the more than nine months that have passed since the incident that gave rise to this dispute.  (Ex. A, LigTel Interrogatory Responses at 7-9 (Answer to Interrogatory No. 5).)  And even from that isolated, apparently anomalous incident, LigTel has failed to identify any actual harm that it suffered.

16

In addition, LigTel's delay of approximately seven months in filing suit—from July 2019 until January 2020—further undermines any credible claim that LigTel will suffer irreparable harm absent a preliminary injunction.  *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) (explaining that "[d]elay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered").  The lack of any likelihood of irreparable harm is underscored by LigTel's inability to identify even a single additional instance of network operator "confusion" in the more than nine months that have passed since early July 2019.  (Ex. A, LigTel Interrogatory Responses at 7-9 (Answer to Interrogatory No. 5).)  .

Finally, Baicells is now on the cusp of—indeed less than three months away from—completing its transition to its new HNI code, which will eliminate any risk of even the sort of isolated, anomalous incident among two network operators that took place nearly a year ago.  Indeed, not only has Baicells' migration progress satisfied the IOC, but Baicells has also announced to its own customers that it will retire the HNI Code 31198 effective July 1, 2020, and that all customers must transition to the new HNI Code.  (Harnish Decl. ¶¶ 38-41.)

In short, LigTel has failed to show any likelihood of irreparable harm if a preliminary injunction is not granted.  Moreover, its own seven-month delay in bringing suit undermines the credibility of any claim of irreparable harm.  For these reasons, its Motion should be denied.

### B.        LigTel has an adequate remedy at law.

In addition, LigTel has previously put a price tag on its alleged harm, demonstrating that it has an adequate remedy at law.  Indeed, at the July 29, 2019, meeting between Baicells and LigTel, LigTel demanded that Baicells pay $1,000,000 to compensate LigTel for the acquisition of the LigTel HNI Code and, among other things, the costs of transitioning to a new HNI code.

(Wei Decl. ¶ 14; Harnish Decl. Ex. 1.)   After making such a demand, LigTel cannot now credibly argue that monetary damages would be "seriously deficient as a remedy for the harm suffered."   *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Accordingly, LigTel's Motion should be denied.

### III.   Even if LigTel were able to pass the threshold test for a preliminary injunction— and it cannot—the balance of harms weighs heavily in favor of Baicells and precludes a preliminary injunction.

The Court need not reach the second phase of the preliminary injunction test, because LigTel has failed to satisfy <u>any</u> of the three requirements of the first phase of the test—*i.e.*, LigTel (i) has no likelihood of success on the merits of its claims, (ii) cannot demonstrate that it is likely to suffer irreparable harm absent a preliminary injunction, and (iii) has an adequate remedy at law.   Each of those failures independently relieves this Court of any obligation to reach the second phase of the preliminary injunction test, in which it would perform the balance-of-harms analysis and consider the public interest.   *See AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 831 (7th Cir. 2002).

However, even if the Court reaches the second phase of the preliminary injunction test, the result should be the same, because the balance of harms weighs heavily in favor of Baicells here, and the public interest also weighs against a preliminary injunction.   For these additional reasons, LigTel's Motion should be denied.

### A.   Baicells will suffer significantly more harm from a preliminary injunction than any harm LigTel will suffer from the denial of an injunction.

Even if LigTel could show that it had a reasonable chance of succeeding on the merits— and for all the reasons explained above, it has a far lower chance of success on the merits that does not even rise to the level required to clear the threshold phase of the preliminary injunction test—LigTel would still have to "show that it would suffer more harm from the denial of an

injunction than [Baicells] would suffer from the entry of an injunction." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir. 2001).  LigTel cannot make such a showing because it is unlikely to suffer <u>any</u> harm without an injunction, whereas Baicells and its customers would be seriously harmed by an injunction.

As discussed above, LigTel cannot show that it will be irreparably harmed absent an injunction.  LigTel has failed to show any harm resulting even from the lone incident that gave rise to this dispute, which involved confusion regarding the source of spectrum-interference among network operators in mid-2019.  The lack of irreparable harm to LigTel is underscored by LigTel's own decision to wait approximately seven months between learning of Baicells' use of the HNI code 31198 and filing its Complaint in this case.  *Ty, Inc.*, 237 F.3d at 903.

In addition to LigTel's own delay in filing suit, the intervening nine-month time period has demonstrated that, in fact, LigTel would suffer no harm whatsoever absent injunctive relief. Indeed, since the incident that gave rise to this dispute more than nine months ago, there has not been even a single additional incident of "confusion" among network operators, let alone one that could cause any conceivable harm to LigTel.  (Ex. A, LigTel Interrogatory Responses at 7-9 (Answer to Interrogatory No. 5).)  Thus, there is no merit to LigTel's farfetched claim that Baicells' use of the 31198 HNI code "creates a high likelihood of confusion among other wireless service providers, which will think that any problems or interference caused by BaiCells's equipment are actually problems caused by LigTel and that LigTel is not complying with ITU and ATIS communications rules."  (Compl. ¶ 49.)

Meanwhile, Baicells has been working diligently to migrate its customers to its new HNI/PLMN code of 314-030.  Baicells began planning the migration in August 2019 and expects the migration to be completed by July 2020.  (Ex. B, Baicells Interrogatory Responses at 13-14

(Answer to Interrogatory No. 10).)   On March 18, 2020, Baicells announced that it will be retiring the old HNI code (31198), effective July 1, 2020, and instructed all customers to upgrade to the latest software releases to enable customers to migrate to the new HNI code (314-030). (*Id.*)

Thus far, approximately one quarter of Baicells customers have transitioned equipment to utilize the new HNI code, and Baicells is diligently working to assist the rest of its customers in completing the transition.   (*Id.* at 16-17.)   If Baicells were forced to immediately stop using the 31198 HNI code, before this transition is complete, it would cause severe disruptions to more than 300 Baicells network-operator customers and the many thousands of end users whom they serve.   (*Id.*)   This would be certain to cause severe, irreparable harm to the relationship between Baicells and its customers—and LigTel has identified no comparable harm, or any harm at all, that would result from the injunction being denied.

Moreover, the respective harms to the parties must be weighed on a sliding scale—the less likely LigTel is to prevail on the merits, the more heavily the balance of harms must weigh in its favor for the Court to issue a preliminary injunction.   *See Girl Scouts*, 549 F.3d at 1086. Here, the sliding scale tips entirely in favor of Baicells—not only would Baicells suffer far more severe and irreparable harm as a result of an injunction, but LigTel's claims are also exceptionally weak on the merits.   *See id.*; *see also Trustees of Teamsters Union No. 142 Pension Fund v. AJ & S Trucking, Inc.*, 992 F. Supp. 2d 870, 877 (N.D. Ind. 2014) (explaining the sliding-scale approach).

In short, even if LigTel were to survive the threshold phase of the two-phase test for a preliminary injunction—which it does not—the balance of harms still weighs heavily in favor of Baicells, who would suffer significant and irreparable harm to its customer relationships by the

issuance of an injunction.  Coupled with the fundamental weakness of LigTel's claims on the merits, this compels the denial of LigTel's Motion.

>   **B.**     **The public interest also weighs strongly against an injunction.**

Finally, the Court must also weigh the public interest in denying or granting the injunction.  *Ty, Inc.* 237 F.3d at 895-96; *see also AM Gen. Corp.*, 311 F.3d at 831-32 (considering harm to third parties as part of balancing-of-harms analysis).  Here, the public interest weighs heavily against a preliminary injunction.  The issuance of an injunction would severely disrupt operations for more than 300 Baicells customers who have yet to transition to the new HNI code, as well as the thousands of end users served by those Baicells customers.  *Id.* (recognizing that the public interest includes the interests of non-parties).  The harm to Baicells customers and their end users is likely to be particularly acute during the COVID-19 crisis, as an unprecedented proportion of the population is currently relying on internet services to perform essential functions like working from home, studying for school, attending remote medical appointments, and more.  *See, e.g.*, Mark Beech, COVID-19 Pushes Up Internet Use 70% And Streaming More Than 12%, First Figures Reveal, Forbes (Mar. 25, 2020), https://www.forbes.com/sites/markbeech/2020/03/25/covid-19-pushes-up-internet-use-70-streaming-more-than-12-first-figures-reveal/#e056f073104e (last visited April 2, 2020).  The potential harm to these third parties could be devastating, especially under current circumstances, and weighs heavily against the issuance of a preliminary injunction.

In short, consideration of the public interest also weighs heavily against the issuance of a preliminary injunction, which would cause significant disruptions for thousands of third parties who are not parties to this matter.

## **CONCLUSION**

A preliminary injunction is a drastic remedy that is "never to be indulged in except in a case clearly demanding it." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (citation omitted). This is not that case. LigTel's claims have no likelihood of success on the merits, and it will not suffer any irreparable harm if an injunction is not granted. In addition, LigTel has an adequate remedy at law, as it has already put a price tag on its harm in this case. Moreover, the balance of harms weighs heavily in favor of Baicells, who would suffer severe and irreparable harm to its customer relationships if an injunction were granted. And finally, the public interest also weighs against an injunction, which would cause substantial disruption to hundreds of Baicells customers and thousands of the end users they serve.

In short, LigTel satisfies <u>none</u> of the requirements for the issuance of a preliminary injunction. For all of these reasons, LigTel's Motion should be denied.

Respectfully submitted,

ICE MILLER LLP


*/s/  Adam Arceneaux*
Adam Arceneaux, Attorney No. 17219-49
Eric J. McKeown, Attorney No. 27597-49
Jessa DeGroote, Attorney No. 358487-49

***Attorneys for Defendants, Baicells Technologies Inc. and Baicells Technologies North America, Inc.***

22

One American Square
Suite 2900
Indianapolis, IN  46282-0200
Phone:  (317) 236-2100
Fax:    (317) 236-2219
Adam.Arceneaux@icemiller.com

### CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system:

*/s/ Adam Arceneaux*
Adam Arceneaux, Attorney No. 17219-49

ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN  46282-0200
Adam.Arceneaux@icemiller.com