**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| **LIGTEL COMMUNICATIONS, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 1:20-cv-00037-HAB-SLC** |
| **BAICELLS TECHNOLOGIES INC.;** **BAICELLS TECHNOLOGIES NORTH** **AMERICA INC.,** | |
| **Defendants.** | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO LIGTEL'S PRE-HEARING MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

Defendants Baicells Technologies Inc. and Baicells Technologies North America Inc. ("Baicells"), by counsel, hereby submit this Response in Opposition to LigTel's Pre-Hearing Memorandum of Law (the "LigTel Pre-Hearing Brief") in Support of Plaintiff's Motion for a Preliminary Injunction (the "Motion").[1]

## INTRODUCTION

LigTel's Pre-Hearing Brief reinforces that LigTel fails to meet _any_ of the requirements for the extraordinary remedy of a preliminary injunction. Accordingly, its Motion should be denied.

First, LigTel has failed to demonstrate that irreparable harm is likely if a preliminary injunction is not granted. In fact, Baicells is just weeks away from completing its months-long transition to a new HNI Code, which will eliminate any possible recurrence of the isolated,

---

[1] LigTel's Motion is ECF No. 4, and its supporting memorandum of law ("LigTel Mem.") is ECF No. 5. LigTel's Pre-Hearing Brief is ECF No. 36.

anomalous incident that gave rise to this dispute in June 2019.[2]  Moreover, that lone incident caused no harm to LigTel, and LigTel now relies only on speculative, theoretical harms—none of which have actually occurred in the nearly four years that Baicells has used the HNI Code 31198—that are insufficient to support a preliminary injunction.  This alone compels the denial of LigTel's Motion.

Second, LigTel has failed to demonstrate that it lacks an adequate remedy at law.  Indeed, LigTel previously put a price tag on its alleged harm, and cannot now credibly claim that a monetary award would be insufficient if Baicells actually caused it any legally actionable harm.

Third, LigTel has no chance of succeeding on the merits of its claims.  LigTel's Lanham Act Claims and state-law unfair competition claim are doomed to fail because the LigTel HNI Code does not identify LigTel as a source of goods or services to consumers, and there is no risk of consumer confusion arising from Baicells' use of the HNI code 31198.  Likewise, LigTel's trade-secrets claims cannot succeed on the merits.  Baicells does not and has never possessed any of LigTel's trade secrets, nor does Baicells have any motive or incentive to misappropriate LigTel's trade secrets.  LigTel's arguments to the contrary are a series of red herrings.

Finally, the balance of harms strongly weighs in Baicells' favor.  If a preliminary injunction were granted, hundreds of Baicells customers would lose their ability to provide internet access to their customers, and thousands of those end-user customers in rural areas would lose their exclusive source of broadband internet access.  This would cause severe and irreparable harm to Baicells' relationships with its own customers, and would also deprive thousands of rural consumers of their broadband internet access during a time when such access is especially crucial due to the COVID-19 pandemic.  In contrast, LigTel is highly unlikely to

---

[2] Capitalized terms herein have the meaning ascribed to them in Baicells' Memorandum of Law in Opposition to LigTel's Motion for Preliminary Injunction filed at ECF No. 35.

suffer any harm whatsoever—indeed, it has suffered no discernible harm in the nearly four years that Baicells has continuously used the HNI code 31198, which will cease in a matter of weeks.

For all of these reasons, LigTel's Motion should be denied.

## **ARGUMENT**

I.  **LigTel faces no threat of irreparable harm, and its litany of speculative, remote harms is insufficient to carry its burden to show a likelihood of such harm.**

To obtain the extraordinary remedy of a preliminary injunction, LigTel is required to make a "clear showing" of both irreparable harm and the absence of an adequate remedy at law. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). LigTel can show neither.

Rather, as of July 1, 2020, Baicells will complete its months-long transition to a new HNI code, which will eliminate any possibility of even the single, isolated incident more than nine months ago that gave rise to this dispute. And even that lone, anomalous incident of temporary confusion between network operators caused no harm to LigTel.

Moreover, the litany of speculative, theoretical harms set forth by LigTel in its Pre-Hearing Brief is insufficient to carry its burden in seeking a preliminary injunction. There appears to be no realistic possibility that any of these harms will ever materialize. In fact, over the course of the nearly four years during which Baicells has used the HNI Code 31198—a time period which will come to an end in a matter of weeks—LigTel has been unable to identify even a single instance when any such harms have occurred. Thus, LigTel has fallen far short of its burden to make a clear showing that irreparable harm is likely in the absence of a preliminary injunction.

Finally, LigTel has an adequate remedy at law, as it already put a price tag on its purported harm when it demanded $1,000,000 from Baicells many months before filing this lawsuit. Thus, by LigTel's own admission, it could be made whole by a monetary award if, in

fact, Baicells has caused it any legally actionable harm—but Baicells has not done so, and will not do so in the future.

Accordingly, and as explained further below, LigTel's Motion should be denied.

**A. Baicells is nearing completion of its months-long, IOC/ATIS-approved transition to its new HNI code.**

As a threshold matter, LigTel cannot show irreparable harm because—after nearly four years of Baicells' continuous use of the HNI Code 31198 without causing any harm to LigTel—Baicells is just weeks away from completing the transition of its customers to a new HNI code.

Baicells will complete the migration of its customers to the new PLMN/HNI Code 314-030 by July 1, 2020.  (Supplemental Decl. of Rick Harnish ("Supp. Harnish Decl.") ¶ 3.)  This is the final phase of a five-phase migration plan, which was first submitted to IOC/ATIS in September 2019.  (*Id.* ¶¶ 16-17.)  The July 1, 2020 completion date is consistent with Baicells' initial migration plan, and also with the periodic updates that Baicells has provided to IOC/ATIS over the ensuing months.  (*Id.* ¶ 16.)

The five phases of the migration have included:  (1) acquisition of a new PLMN/HNI code; (2) software development and new cloud EPC integration to utilize the new PLMN/HNI code; (3) scenarios testing and migration preparation; (4) networks validation; and (5) the announcement and commencement of commercial networks migration.  (*Id.* ¶ 17; *see also* Exhibit 2 to Harnish Decl., at BAICELLS_000032554.)  The final phase of this plan—the migration of customer networks to the new PLMN/HNI Code 314-030—is now well under way. (Supp. Harnish Decl. ¶¶ 16-18.)

During the migration, Baicells has been operating two separate CloudCore EPC environments—the original environment using PLMN/HNI Code 31198, and a new environment using PLMN/HNI Code 314-030.  (Supp. Harnish. Decl. ¶ 4.)  But on July 1, 2020, Baicells will

retire the old environment, which utilizes the HNI Code 31198. (*Id.* ¶ 5.) As of that date, any network operator that has not upgraded to recently released Baicells firmware utilizing the new HNI code will risk going offline. (*Id.*)

Baicells publicly announced the July 1, 2020 retirement date to its customers on March 18, 2020. (Supp. Harnish Decl. ¶¶ 5, 32.) Baicells recently followed up via email to all network-operator customers, directing them to upgrade all eNodeBs—the base stations that broadcast a signal utilizing the HNI/PLMN code—to the latest software utilizing the new HNI/PLMN code, and further directed customers to report any issues to a technical support email address. (*Id.* ¶¶ 33-34.)

As of April 7, 2020, over 26% of Baicells' network-operator customers have completed the final step of transitioning to the new 314-030 HNI code. (*Id.* ¶ 35.) Ultimately, all of Baicells' network-operator customers must complete the transition to the new HNI code by July 1, 2020, when the environment that supports the old HNI code will be shut down. (*Id.* ¶¶ 5-6.)

In short, Baicells has been using the HNI Code 31198 for nearly four years without causing any harm to LigTel. Indeed, LigTel makes no plausible claim that it was harmed by the single, isolated incident of network-operator confusion in June 2019 that gave rise to this dispute. Now, with Baicells on the verge of completing its transition to the new HNI Code 314-030, LigTel cannot credibly argue that it will face any harm—let alone the sort of irreparable harm sufficient to warrant the extraordinary remedy of a preliminary injunction—in the remaining weeks of Baicells' migration process.

For this reason alone, LigTel falls well short of its burden to make a clear showing of irreparable harm absent a preliminary injunction.

**B.      The litany of speculative, remote harms set forth by LigTel is insufficient to carry LigTel's burden to make a clear showing that irreparable harm is likely.**

Unable to identify any actual harm that it has suffered in the nearly four years that Baicells has used the HNI Code 31198, LigTel offers a number of speculative, theoretical harms that it argues "may" or "could" occur in the absence of a preliminary injunction.  (LigTel Pre-Hearing Br. at 12-13.)   This is insufficient to make the clear showing of a <u>likelihood</u> of irreparable harm that is required for a preliminary injunction.

In order to obtain the "extraordinary remedy" of a preliminary injunction, LigTel must "demonstrate that irreparable injury is *likely* in the absence of an injunction," and the mere "possibility" of such injury is not enough.  *Winter*, 555 U.S. at 22 (emphasis in original); *see also Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. Of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) ("The moving party must demonstrate that [it] will <u>likely</u> suffer irreparable harm absent obtaining preliminary injunctive relief." (emphasis added)).  It is well-established that "[a] preliminary injunction will not be issued simply to prevent the <u>possibility</u> of some remote future injury."  *Winter*, 555 U.S. at 22 (citation omitted) (emphasis added).  The list of speculative, remote harms set forth by LigTel plainly fails to meet this standard.

LigTel first argues that Baicells' use of the HNI code 31198 "mak[es] the networks of Baicells's customers appear as LigTel's network[.]"  (LigTel Pre-Hearing Br. at 13 (citing Wentworth Decl. ¶¶ 19, 38, 41).)  But in the nearly four years that Baicells has used the HNI code 31198, there has been <u>only one instance</u> of a network operator mistakenly identifying a Baicells customer as LigTel.  Moreover, even that momentary confusion was immediately put to rest, resulting in no harm to LigTel.  (*See* Ex. 3 to Gillett Decl. dated Apr. 3, 2020 (June 26, 2019 email chain between LigTel and Viaero Wireless).)  This isolated, anomalous incident, which

was quickly resolved with no harm to LigTel, is wholly insufficient to show that LigTel is <u>likely</u> to suffer irreparable harm in the absence of a preliminary injunction.

LigTel next argues that Baicells "makes it appear that LigTel does not comply with international and industry-imposed rules, and creates an impression that LigTel cannot properly manage its network." (LigTel Pre-Hearing Br. at 13 (citing Wentworth Decl. ¶¶ 38, 41).) But LigTel fails to identify a single instance in which <u>anyone</u> has drawn this conclusion in the nearly four years that Baicells has used the HNI code 31198. (*See id.*) Moreover, there is no plausible explanation for why anyone would draw this conclusion—indeed, in the lone instance of temporary confusion identified by LigTel, the network provider, Viaero Wireless, drew just the <u>opposite</u> conclusion, blaming Baicells for the confusion, not LigTel. (*See* Ex. 3 to Gillett Decl. dated Apr. 3, 2020 (June 26, 2019 email chain between LigTel and Viaero Wireless).) Thus, neither LigTel's speculative assertion nor the lone instance of confusion demonstrates any likelihood of irreparable harm.

Similarly, LigTel asserts that Baicells' use of the HNI Code 31198 could "lead[] other providers to treat LigTel less favorably, which <u>may</u> ultimately frustrate LigTel's ability to serve its customers." (LigTel Pre-Hearing Br. at 13 (citing Wentworth Decl. ¶¶ 41-42) (emphasis added).) But again, LigTel fails to identify a single instance in which another provider has "treat[ed] LigTel less favorably," despite nearly four years of continuous use of the HNI code 31198 by Baicells, demonstrating the fundamental implausibility of LigTel's assertion. (*See id.*) Likewise, LigTel's speculative assertion that such unfavorable treatment "<u>may</u> ultimately frustrate LigTel's ability to serve its customers[,]" (LigTel Pre-Hearing Br. at 13 (emphasis added)), is the sort of "mere possibility" of harm that is insufficient to support a preliminary injunction. *Whitaker*, 858 F.3d at 1045; *see also Orr v. Shicker*, 953 F.3d 490, 492 (7th Cir.

2020) (reversing grant of preliminary injunction where district court "found only that a substantial risk 'could' arise, not that irreparable harm was likely").  These speculative assertions also fail to demonstrate any likelihood of irreparable harm.

LigTel next asserts that Baicells' actions "threaten[] LigTel's reputation with customers, who <u>could</u> interpret Baicells's actions as showing that LigTel cannot control its network or protect its customers' personal information and confidential communications."  (LigTel Pre-Hearing Br. at 13 (citing Wentworth Decl. ¶¶ 41-42).)  LigTel fails to provide any evidence or explanation to support this wholly speculative assertion, which is only a guess about how LigTel customers "could" interpret certain alleged actions by Baicells.  Moreover, this assertion is refuted by documents produced by LigTel in this matter, which demonstrate that Baicells does <u>not</u> possess LigTel's encryption codes, and that Baicells equipment poses no risk to the integrity of LigTel's network or LigTel's customer information.  *See* (Ex. C, LT000534-535 (Email from Mead to Wentworth dated October 30, 2019, which states "We purchased a Bai Cells SIM card from one of their suppliers and tested it on our network. That test verified that Bai Cells is not using our encryption codes.")). [3]  Thus, there is no actual risk that this speculative assertion could materialize, and it falls far short of demonstrating any likelihood of irreparable harm.

LigTel also asserts that Baicells' use of the HNI Code 31198 "<u>may</u> cause law enforcement to seek information from LigTel about individuals who appears to be LigTel subscribers, when in fact they are not." (LigTel Pre-Hearing Br. at 13 (citing Wentworth Decl. ¶ 36; Mead Decl. ¶¶ 26, 32).)  On its face, this assertion is inherently speculative, and LigTel fails to identify a single instance in the nearly four years that Baicells has used the HNI Code 31198

---

[3] All references to "Ex. __" herein are references to exhibits to the Declaration of Jessa DeGroote, ECF No. 35-1, and the Supplemental Declaration of Jessa DeGroote, which is being filed herewith, unless indicated otherwise. Exhibits A and B were filed with the Declaration of Jessa DeGroote, and subsequent exhibits in this series are being filed the Supplemental Declaration of Jessa DeGroote.

in which law enforcement has sought "information from LigTel about individuals who appear to be LigTel subscribers, when in fact they are not." (LigTel Pre-Hearing Br. at 13.) Moreover, documents produced by LigTel in this matter demonstrate that this is not likely at all—rather, law enforcement officials typically rely upon an Internet Protocol ("IP") address, which does not include a PLMN/HNI code, and may then ask a wireless provider to utilize its IMSI information to assist in identifying the individual associated with that IP address. (*See, e.g.*, Ex. D, LT000669; Ex. E, LT001302.) This is consistent with Baicells' own experience in handling such requests. (Supplemental Declaration of Jesse Raasch "Supp. Raasch Decl." ¶ 24.) Thus, there is no risk that Baicells' use of the HNI code 31198 could "harm[] LigTel's reputation with law enforcement[,]" (LigTel Pre-Hearing Br. at 13), and this speculative assertion is also insufficient to demonstrate a likelihood of irreparable harm.

Finally, LigTel makes various references to "manag[ing] customers roaming on another provider's network," "determin[ing] what (if any) roaming charges are required," and the potential for "erroneous roaming charges," without explaining how such issues could occur or cause any harm to LigTel. (LigTel Pre-Hearing Br. at 4-5, 11, 25.) LigTel also fails to identify any actual instances of such roaming issues in the nearly four years that Baicells has used the HNI Code 31198. That is because, in reality, roaming is not an issue at all.

In order for an end-user device to roam on a third-party network—*i.e.* a network other than its home network—a series of authentication steps must occur. (*See* Supp. Raasch Decl. ¶¶ 12-18.) Those authentication steps rely not only on the IMSI, but also on other critical information stored on an end-user device's SIM card, including a subscriber authentication key (or "K") that is unique for each SIM card, and an operator code (or "OP") that is used for all SIM cards issued by a particular operator. (*See* Supp. Raasch Decl. ¶¶ 4-11.) The combination of this

information, along with the IMSI number, is used to authenticate an end-user device to a wireless network.  (*See id.* ¶¶ 8-9.)  Because <u>all</u> authentication information must match exactly in order for roaming to occur, an end-user device using a Baicells SIM card—even one with an IMSI still using the HNI Code 31198—cannot authenticate to an unauthorized third-party network and incur roaming charges as though it were a LigTel user.  (*Id.* ¶¶ 4, 10-11, 19-22; Raasch Decl. ¶ 34.)

It is therefore unsurprising that LigTel has identified <u>no actual instances</u> of any roaming-related issues in the nearly four years that Baicells has used the HNI Code 31198.  Indeed, in addition to the technical unfeasibility explained above, Baicells' customers are also generally network operators who provide <u>fixed</u> wireless broadband internet services, rather than mobile services.  (Harnish Decl. ¶ 7.)  And as LigTel is well aware from its own tests using Baicells SIM cards, "Bai Cells is not using [LigTel's] encryption codes." (*See* Ex. C, LT000534-35).

In short, end users with Baicells SIM cards can neither access LigTel's network nor incur roaming charges on other networks that will be erroneously attributed to LigTel.  (*See* Raasch Decl. ¶¶ 4, 10-11, 19-22.)  Thus, this is another theoretical, unlikely harm that is insufficient to support a preliminary injunction.

To the extent that LigTel attempts to rely on a presumption of irreparable harm, (*see* LigTel Pre-Hearing Br. at 12), any such presumption has been rebutted for all of the foregoing reasons, as well as due to LigTel's own delay of approximately seven months in bringing suit. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001).

Moreover, no such presumption exists following the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), which rejected a presumption of irreparable harm in patent cases, and the Seventh Circuit's subsequent decision in *Flava Works, Inc. v*

*Gunter*, 689 F.3d 754 (7th Cir. 2012), which extended this principle to copyright cases.  *See Flava Works*, 689 F.3d at 755 (concluding that *eBay* also "governs a motion for a preliminary injunction in a copyright case").  Indeed, district courts in the Seventh Circuit have already concluded, based on *eBay* and *Flava Works*, that the same principle applies in the trademark context, and thus there is no longer any presumption of irreparable harm for Lanham Act claims. *See, e.g.*, *Health King Enters., Inc. v. Dalian Health King Prods. Co.*, 2020 WL 1201533, at *3 & n.4 (N.D. Ill. Mar. 12, 2020) (explaining that "[a]lthough the Seventh Circuit has not yet had an opportunity to address whether *eBay*'s holding applies in trademark infringement cases . . . the Court does not find . . . any basis for differentiation"); *Illinois Tamale Co. v. El-Greg Inc.*, 2019 WL 4395139, at *19 (N.D. Ill. Sep. 13, 2019) (declining to apply a presumption of irreparable harm to Lanham Act claims in light of *eBay* and *Flava Works* and explaining that "[t]his Court sees no reason why the Seventh Circuit would reach a different conclusion in a Lanham Act case").

Indeed, this Court has explained that although federal courts have previously "presumed irreparable harm in certain types of cases, . . . the Supreme Court has made clear that all four elements must be shown and irreparable harm cannot be presumed."  *Furrion Prop. Holding Ltd. v. Way Interglobal Network, LLC*, 2019 WL 5587147, at *4 (N.D. Ind. Oct. 30, 2019).  And although the Seventh Circuit has not yet had occasion to address this issue in the Lanham Act context, several other Courts of Appeals have already concluded that *eBay* controls and there is therefore no presumption of irreparable harm for Lanham Act claims.[4]  Thus, no such presumption should apply here.

---

[4] *See, e.g.*, *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013) (holding that the Supreme Court's pronouncement "that a plaintiff must establish irreparable harm—applies to a preliminary injunction in a trademark infringement case"); *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 217 (3d Cir. 2014) (holding "that a party seeking a preliminary injunction in a Lanham Act case is not entitled to a

In short, LigTel has failed to carry its burden to make a "clear showing" that irreparable harm is likely.  *See Winter*, 555 U.S. at 22.  Accordingly, it is not entitled to the "extraordinary remedy" of a preliminary injunction.  *See id.*

### C.      LigTel has failed to show the lack of an adequate remedy at law.

Finally, LigTel has failed to show that is lacks an adequate remedy at law.  It is undisputed that LigTel previously demanded $1,000,000 from Baicells to compensate LigTel for its purported harm many months before LigTel filed this lawsuit.  (*See* Baicells Opening Br. at 17-18.)  Thus, LigTel cannot now credibly argue that a monetary award would be insufficient to address any harm that it has purportedly suffered—and in any event, it has suffered no harm.

The availability of an adequate remedy at law also compels the denial of LigTel's Motion.

### II.      LigTel's Pre-Hearing Brief confirms that its claims have no chance of success on the merits.

While LigTel's failure to demonstrate the likelihood of irreparable harm or the lack of an adequate remedy at law compels the denial of its request for preliminary injunction, it is also axiomatic that "[a] party with no chance of success on the merits cannot attain a preliminary injunction."  *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002) (citation omitted).  LigTel's Pre-Hearing Brief further demonstrates that it is just such a party.  Accordingly, for this separate and independent reason, LigTel is not entitled to a preliminary injunction.

---

presumption of irreparable harm but rather is required to demonstrate that she is likely to suffer irreparable harm if an injunction is not granted"); *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) ("After *eBay*, however, courts must not simply presume irreparable harm. Rather, plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." (citations omitted)); *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (holding that, under *eBay*, plaintiff was not entitled to injunctive relief absent an actual showing of irreparable injury).

**A.      LigTel's Lanham Act Claims and state-law unfair competition claim have no chance of success on the merits.**

To prevail on its claims under Section 43(a) of the Lanham Act, LigTel "must be able to show (1) that its mark is protectable, and (2) that [Baicells'] use of that mark is likely to cause confusion among consumers." *Phoenix Entm't Partners v. Rumsey*, 829 F.3d 817, 822 (7th Cir. 2016) (citing 15 U.S.C. § 1125(a), which codifies Section 43(a) of the Lanham Act).  LigTel's Pre-Hearing Brief confirms that LigTel cannot make either showing.   Thus, LigTel cannot succeed on the merits of its Lanham Act Claims.

1.      The LigTel HNI Code is not protectable because it does not identify LigTel as a source of goods or services to consumers.

The LigTel HNI Code is not protectable because LigTel cannot demonstrate, *inter alia*, "public identification of [the LigTel HNI Code] with a product or service" by consumers. *Johnny Blastoff, Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 434 (7th Cir. 1999).  LigTel has the burden to show that its mark is protectable, as the LigTel HNI Code is not a registered trademark with the USPTO.  *Platinum Home Mortg. Co. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 727 (7th Cir. 1998).  LigTel cannot carry this burden.

A mark may qualify for protection only "when <u>consumers</u> rely on [the mark] to identify and distinguish one company's good or services from those of its competitors." *Id.* at 727 (emphasis added); *see also Lincoln Fin. Advisors Corp. v. Sagepoint Fin. Inc.*, 2009 WL 928993, at *5 (N.D. Ind. Apr. 2, 2009) (explaining that a mark may be protectable only if it "specifically identifies and distinguishes one company's goods or services from those of its competitors").  A plaintiff must show "use in a way sufficiently public to identify or distinguish the marked goods [or services] in an appropriate segment of the public mind as those of [the adopter of the mark]." *Johnny Blastoff*, 188 F.3d at 433-34 (internal quotation and citation omitted) (second set of

brackets in original); *see also Agler v. Westheimer Corp.*, 143 F. Supp. 3d 766, 774 (N.D. Ind. 2015) (same).

One factor central in this analysis is whether the plaintiff actually uses the mark to advertise and/or promote its goods or services. *See Johnny Blastoff*, 188 F.3d at 434 (explaining that "the fact-finder may rely on the use of the mark in," among other things, "advertising brochures, catalogs, newspaper ads," and other "media outlets such as television and radio" (internal quotation and citation omitted)). Similarly, to satisfy the "use in commerce" statutory requirement, LigTel must be able to show that it uses or displays the LigTel HNI Code in the sale or advertising of its services. *See Vision Ctr. Nw., Inc. v. Vision Value, LLC*, 673 F. Supp. 2d 679, 686 (N.D. Ind. 2009) (citing 15 U.S.C. § 1127).

But as explained in Baicells' Opening Brief, LigTel cannot satisfy these requirements, because it does <u>not</u> use the LigTel HNI Code in the advertisement or promotion of its goods or services. (*See* Baicells Opening Br. at 11 (citing Ex. A, LigTel Interrogatory Responses at 6-7 (Answer to Interrogatory No. 4)).) Nor has LigTel presented any evidence, or any plausible argument, to suggest that <u>consumers</u> somehow connect the LigTel HNI Code—which is buried within the gadgetry used to identify and authenticate end-user devices to wireless networks, and is not transparent to the end-user consumer—in any way with LigTel as a provider of goods or services. (*See* Baicells Opening Br. at 9 (citing Raasch Decl. ¶¶ 21-22).)

LigTel's Pre-Hearing Brief attempts to gloss over this fundamental problem, asserting in a conclusory footnote that the LigTel HNI Code is protectable because (1) "LigTel uses it in connection with its business" and (2) "LigTel is publicly identified with and distinguished be [sic] that code" based on the fact that ATIS has assigned that code to LigTel. (LigTel Pre-Hearing Br. at 15 n.1.) But this argument cannot save LigTel's Lanham Act Claims.

14

First, LigTel's use of its HNI code "in connection with its business" is insufficient for protectability, as it does not demonstrate that "consumers rely on [the mark] to identify and distinguish [LigTel's] goods or services from those of its competitors." *Platinum Home Mortg.*, 149 F.3d at 727; *see also Johnny Blastoff*, 188 F.3d at 433-34; 15 U.S.C. § 1127. Likewise, ATIS' assignment of the HNI code 311-980 to LigTel fails to show or even suggest that consumers rely upon the HNI code to identify and distinguish LigTel as the source of goods or services. *See id.*

In short, LigTel cannot show that consumers rely upon the LigTel HNI Code as a source-identifying mark for LigTel's goods or services. This underscores the fundamental flaw in these claims—the Lanham Act is not intended to protect obscure product features, such as HNI codes, that serve important functions but nevertheless fail to serve any source-identifying function for the consumer. Thus, LigTel's Lanham Act Claims are an attempt to fit a square peg into a round hole. For this reason alone, LigTel's Lanham Act Claims have no chance of success on the merits.

> 2. LigTel cannot demonstrate that Baicells' use of the HNI Code 31198 is likely to cause consumer confusion.

As explained in Baicells' Opening Brief, LigTel has not shown and cannot show that Baicells' use of the HNI Code 31198 is likely to cause consumer confusion. This is because consumers do not rely upon the LigTel HNI Code—which is neither visible nor meaningful in any way to the ordinary consumer—to identify and distinguish LigTel as the source of any goods or services. (Baicells Opening Br. at 9-10.)

LigTel correctly notes that two of the most important factors in the seven-factor test for likelihood of consumer confusion are "any evidence of actual confusion" and "the defendant's intent (or lack thereof) to palm off its product as that of another." *Eli Lilly & Co. v. Nat.*

15

*Answers, Inc.*, 233 F.3d 456, 461-62 (7th Cir. 2000) (quoted in LigTel's Pre-Hearing Br. at 16). However, LigTel's application of these factors is entirely wrong—in fact, these two factors conclusively demonstrate that LigTel cannot prevail on its Lanham Act Claims.

First, there is <u>no</u> evidence of actual confusion among consumers here, despite nearly four years of continuous use by Baicells of the HNI Code 31198.  And confusion among consumers regarding the source of goods or services is the only type of confusion that is relevant for purposes of the Lanham Act.  *See Malibu, Inc. v. Reasonover*, 246 F. Supp. 2d 1008, 1016 (N.D. Ind. 2003); *see also Rumsey*, 829 F.3d at 829 (explaining that "what [the Supreme Court has made] clear is that a consumer's confusion must be confusion as to the source of the tangible good sold in the marketplace").  LigTel's reliance on a single instance of temporary confusion on the part of one network operator in Nebraska—who was indisputably not "among the relevant class of customers and potential customers" for LigTel—is wholly insufficient to provide any evidence of actual consumer confusion.  *Reasonover*, 246 F. Supp. 2d at 1016.

Second, LigTel has failed to present any evidence or plausible argument that would support an inference that Baicells intended to "pass off" its own goods or services as those of LigTel.  It is undisputed that Baicells and LigTel are not competitors, and the LigTel brand has no value for Baicells—LigTel is a small provider of, among other things, wireless services in seven counties in northern Indiana, whereas Baicells manufactures and sells equipment to network operators throughout the country.  In short, there is no value to Baicells in "passing off" its own goods or services as those of LigTel, (Raasch Decl. ¶ 9), and LigTel's argument to the contrary is nonsensical.

Moreover, other factors from the seven-factor test also demonstrate the absence of any likelihood of consumer confusion.  For example, one such factor is "similarity of the products,"

16

*Reasonover,* 246 F. Supp. 2d at 1015, and it is undisputed that Baicells and LigTel provide wholly distinct categories of goods and services.  Another factor is the "degree of care likely to be exercised by consumers," *id.*, and this factor also cuts against any likelihood of consumer confusion, as consumers are unlikely to be aware that an HNI code even exists.

In short, LigTel is unable to show any likelihood of consumer confusion.  Accordingly, it has no chance of success on its Lanham Act Claims.

### 3.   LigTel's state-law unfair competition claim fails for the same reasons.

As LigTel acknowledges in its Pre-Hearing Brief, its common-law unfair competition claim "tracks the elements of the Lanham Act."  (LigTel Pre-Hearing Br. at 21 (citing *Dwyer Instruments, Inc. v. Sensocon, Inc.*, 873 F. Supp. 2d 1015, 1040 (N.D. Ind. 2012)).)  Thus, this claim fails for the same reasons as LigTel's Lanham Act Claims.

### B.   LigTel's trade-secret claims have no chance of success on the merits.

As set forth in Baicells' opening brief, Baicells does not possess, and has never possessed, any LigTel trade secrets.  (Baicells Opening Br. at 13-16.)  Nor does Baicells have any incentive to acquire or use any of LigTel's trade secrets, as it does not stand to benefit from any trade secrets that LigTel may possess.  (*Id.* at 16.)

LigTel's Pre-Hearing Brief does nothing to refute these basic facts.  Instead, it offers only a series of attenuated, illogical inferences based on a misleading presentation of the relevant evidence.  Accordingly, LigTel's Pre-Hearing Brief further demonstrates that it cannot succeed on the merits of its trade-secrets claims.

### 1.   LigTel's theory depends on a misleading presentation of the facts and an attenuated, illogical series of inferences.

The lynchpin of LigTel's trade-secrets misappropriation theory is Baicells' hiring of Ronald Mao in December 2017.  Mao previously worked for Huawei Technologies USA

("Huawei") as a Product Manager, and during the 2015-16 timeframe, he served LigTel's account in a sales support role—the same role that he served for many other accounts. (*See* Baicells Opening Br. at 15 (citing Mao Decl. ¶¶ 11-12).)

In an effort to lend support to its strained trade-secrets theory, LigTel misrepresents the circumstances of Mao's hiring. LigTel misleadingly asserts that "Baicells hired Ronald Mao as its technical advisor after he touted his work at Huawei on the deployment of LigTel's LTE core." (LigTel Pre-Hearing Br. at 22.) But the exhibit relied upon by LigTel for support demonstrates that this assertion is almost entirely false. First, Mao did not "tout" or single out his experience with LigTel when seeking employment with Baicells—rather, LigTel was included in a broader list of 19 customers whom Mao had serviced while at Huawei. (*See* Ex. 1 to Gillett Decl., at BAICELLS-000013841-82.) Second, contrary to LigTel's assertion, nowhere did Mao state or otherwise indicate that he had "work[ed] . . . on the deployment of LigTel's LTE core." (*See* LigTel Pre-Hearing Br. at 22.) Rather, LigTel appeared only as one in this broader list of customers whom Mao had served while at Huawei. Moreover, Mao did not work on the deployment of LigTel's LTE core. (Mao Decl. ¶ 12-13.) Mao was not brought in until well after LigTel's LTE core had been deployed in 2012. (*Id*.) And finally, contrary to LigTel's assertion, Mao was <u>not</u> hired to serve as Baicells' "technical advisor"—rather, Mao is employed by Baicells as Director of Carrier Solutions, a role similar to the one he held at Huawei. (*See* Baicells Opening Br. at 3; Mao Decl. ¶¶ 3, 12.)

In short, as explained in Baicells' opening brief—and as the emails surrounding Mao's hiring demonstrate—Baicells' hiring of Mao was wholly unrelated to LigTel. (*See* Baicells Opening Br. at 15 (citing Raasch Decl. ¶¶ 35-39).) And this makes logical and intuitive sense, as Baicells manufactures and provides equipment to wireless network operators, and stands to gain

nothing from any trade secrets that LigTel may possess regarding the particular features of its own wireless network configuration.  Raasch Decl. ¶¶ 5-9; Supp. Raasch Decl. ¶ 23.

Nonetheless, LigTel attempts to draw a connection between Baicells' hiring of Mao and its selection of the HNI code 31198.  (*See* LigTel Pre-Hearing Br. at 22-23.)  This is also nonsensical and defies logic.  It is undisputed that Baicells first began using the HNI code 31198 more than two years before it hired Mao.  (Ex. B, Baicells Interrogatory Responses at 3-4 (Answer to Interrogatory No. 1); Raasch Decl. ¶ 39).  There was simply no connection between Baicells' selection of the HNI Code 31198 in 2015 and its subsequent hiring of Mao more than two years later, despite LigTel's strained attempts to connect unrelated events.

LigTel further contends, in an exercise of inaccurate hyperbole, that the odds of Baicells selecting the HNI code 31198 were "infinitesimal."  (LigTel Pre-Hearing Br. at 23.)  This is simply wrong.  Because the first three digits of this code—311—represent the country code for the United States, it is hardly surprising that Baicells selected a two-digit number—of which there are only 99—that happened to match the first two digits of another entity's MNC.  (*See* Baicells Opening Br. at 2 (explaining MCCs and MNCs).)

LigTel nonetheless insists on drawing yet another unsupported and illogical inference— that Baicells must have selected the HNI code 31198 because "Baicells had misappropriated LigTel's trade secrets."  (LigTel Pre-Hearing Br. at 23.)  But this conclusion is not logical at all.  As explained above, Baicells does not have, and has never had, any incentive to acquire or use any trade secret that belongs to LigTel.  (*See* Baicells Opening Br. at 16.)  Moreover, LigTel has utterly failed to explain why, if Baicells had misappropriated any LigTel trade secrets, Baicells would then call attention to itself by using an HNI code that is similar to LigTel's.

The last item LigTel relies upon is an April 17, 2017 email, on which Mao was copied while at Huawei, which included an attachment LigTel claims discussed "locations of towers, development of the LTE work, and other proprietary information[.]"  (S*ee* Wentworth Decl. ¶ 18, Ex. 8).  As a threshold matter, it is not at all apparent that this attachment contained any of the trade-secret information LigTel contends is at issue in this action—its encryption code, network architecture, and network engineering information.[5]  In any event, however, there is no evidence that Mao ever opened or reviewed this attachment, or that he somehow memorized its contents consisting of 16 pages of redacted data.  Moreover, because Mao took no documents or information with him upon leaving Huawei, there is no risk that he misappropriated any trade-secret information belonging to LigTel.  (*See* Baicells Opening Br. at 15 (citing Mao Decl. ¶ 20).)

> 2.  LigTel's own internal documents confirm that Baicells does not possess LigTel's trade secrets.

LigTel repeatedly claims that it cannot be a coincidence that Baicells chose 31198 as its HNI code when LigTel's code is 311-980, but at the same time, LigTel knows that Baicells does not use LigTel's encryption code and knows that Baicells SIM cards cannot connect to LigTel's network.  Indeed, both Mead and Wentworth are well aware that Baicells' SIM cards do not use LigTel's encryption code and are unable to connect to LigTel's network.  On August 1, 2019, Wentworth received a shipment of Baicells SIM cards, and he sent Mead a photo of those SIM cards.  (Wentworth Decl. Ex. 11.)  That same day, Wentworth also emailed Mead regarding "Bai

---

[5]  LigTel claims that "[t]here is no legitimate dispute that the trade secrets at issue are entitled to protection." LigTel Pre-Hearing Br. at 22.  In reality, it is difficult to dispute whether the trade secrets are entitled to protection when LigTel has failed to clearly identify what those trade secrets even are.  *See* (Ex. A, LigTel Interrogatory Responses at 9-10 (Answer to Interrogatory No. 6) (responding to interrogatory requesting LigTel "[i]dentify and describe *in detail* each and every purported trade secret that LigTel alleges is at issue in this lawsuit" by stating that "[t]he LigTel trade secrets at issue in this litigation include LigTel's encryption code (which masks the content of traffic between LigTel's core and subscribers), and LigTel's network architecture, design, and engineering (which includes the proprietary operational layout of LigTel's equipment, core, and servers)" (emphasis added)).)

Cells sim cards," to say that "[t]here are no records from the trace" and that the SIM card was "denied on crypto." (Ex. F, LT000526.) Then, in October, Mead emailed Wentworth a document entitled "Bai Cells Facts," which stated: "We purchased a Bai Cells SIM card from one of their suppliers and tested it on our network. That test verified that Bai Cells is not using our encryption codes on this card." (Ex. C, LT000534-35.) As LigTel clearly knows, Baicells' SIM cards do not contain LigTel's encryption code and cannot connect to LigTel's network. That is because Baicells neither knows nor has any desire to know LigTel's encryption code, nor has any desire to connect to its network.

In short, LigTel's strained trade-secrets misappropriation theory is built upon a misleading presentation of the facts and a series of illogical, attenuated inferences. In reality, the evidence shows that Baicells does not possess, and has never possessed, any trade secrets belonging to LigTel. Moreover, there is no reason why Baicells—as a manufacturer and provider of wireless network equipment—would ever want to possess or use any such trade secrets.

For all of the foregoing reasons, LigTel's trade-secrets claims also have no chance of success on the merits.

### III.   LigTel's Pre-Hearing Brief further reinforces that the balance of harms weighs heavily in favor of Baicells.

As explained above, LigTel has failed to show that irreparable harm is likely or that it lacks an adequate remedy at law, and LigTel also has no chance of success on the merits of its claims. Each of the foregoing failures, standing alone, compels the denial of a preliminary injunction here. However, even if LigTel had managed to satisfy any of the foregoing requirements—and it has not—LigTel still would not be entitled to a preliminary injunction, because the balance of harms weighs heavily in Baicells' favor, and the public interest also

21

weighs heavily against injunctive relief.  *See Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013) (explaining that, even "[i]f the moving party meets this threshold burden, the court weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest . . . on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor").

### A.     Baicells will suffer significantly more harm from a preliminary injunction than any harm LigTel will suffer from the denial of an injunction.

The issuance of a preliminary injunction would result in severe and irreparable harm to Baicells.  If Baicells were immediately enjoined from using the HNI code 31198, hundreds of Baicells network operators would immediately lose the ability to connect to the Baicells CloudCore, and in turn, those Baicells customers would be unable to provide internet service to thousands of their own customers.  (Supp. Harnish Decl. ¶¶ 11-15).  It goes without saying that such an abrupt loss of service would cause severe and irreparable damage to Baicells' relationship with its customers and its business reputation.  (*Id.* ¶¶ 14-15.)

In contrast, as explained in Section I.B *supra*, LigTel can point only to a set of speculative, theoretical harms.  Indeed, in the nearly four years that Baicells has continuously used the HNI code 31198, LigTel has been unable to identify a single instance of such harms occurring.  LigTel cannot credibly claim that it would suffer any comparable harm by waiting a few additional weeks for Baicells to complete its migration process when LigTel has suffered no apparent harm in the last four years.

These respective harms to the parties must be weighed on a sliding scale—the less likely LigTel is to prevail on the merits, the more heavily the balance of harms must weigh in its favor for the Court to issue a preliminary injunction.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008).  Here, the merits of LigTel's

claims—if viable at all—are extremely weak and, as a result, LigTel must show that the risk of harm it faces heavily outweighs the risk of harm to Baicells and the public. *Id.* LigTel cannot do so here because it cannot show it is likely to incur any harm before Baicells completes its migration in a matter of weeks, whereas Baicells will face certain, serious harm from the immediate issuance of an injunction.

> **B.      The public interest also weighs strongly against an injunction.**

The public interest also weighs heavily against a preliminary injunction, as thousands of non-parties would be severely harmed by such an injunction here. *See AM Gen. Corp.*, 311 F.3d at 831-32; *see also Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1121 (7th Cir. 1997) (stating that "[t]he final factor to be considered in conjunction with a preliminary injunction is the public interest, which is the effect that granting or denying the injunction will have on nonparties" (internal quotation and citation omitted)).

Enjoining Baicells' use of the 31198 HNI code would create real and immediate harm for thousands of rural internet customers.   As discussed *supra*, if Baicells were immediately enjoined from using the 31198 HNI code, hundreds of network operators would immediately lose the ability to provide their customers with internet services.  Without internet access, those customers would face significant, and likely insurmountable, obstacles to their ability to perform critical tasks such as working from home, completing school assignments from home, and engaging in telemedicine and other virtual-based medical care.   (Supp. Harnish Decl. ¶ 13.) Additionally, because most of the network operators serve customers who live in rural areas where there are no alternative options for internet service, these customers would be left without internet for an indefinite period of time.  (*Id.* ¶ 8.)  In the midst of the COVID-19 pandemic, when much of the nation is subject to "stay at home" orders, the impact of a preliminary

injunction would be devastating for thousands of rural customers who would lose their broadband internet access.

Thus, the public interest also weighs heavily against a preliminary injunction.  Because the balance of harms also weighs heavily in Baicells' favor, and because LigTel's claims are so weak on the merits, the balance-of-harms analysis independently compels the denial of LigTel's Motion.

## CONCLUSION

LigTel's Pre-Hearing Brief confirms that this is not a case in which the extraordinary remedy of a preliminary injunction is warranted.  LigTel has failed to demonstrate that irreparable harm is likely, and instead relies on a series of remote, speculative harms that are insufficient to support a preliminary injunction.  LigTel also has failed to show that it lacks an adequate remedy at law, as it has already put a price tag on its harm in this case.  LigTel's Pre-Hearing Brief further confirms that it has no chance of success on the merits of any of its claims. While failure to meet any <u>one</u> of the foregoing requirements would be sufficient to compel denial of Ligtel's Motion, LigTel fails to meet <u>any</u> of these requirements.

Moreover, even if LigTel could meet the threshold requirements for a preliminary injunction—and it cannot here, as explained above—the balance of harms still weighs heavily in favor of Baicells, and precludes the issuance of a preliminary injunction.  Likewise, the public interest weighs heavily against a preliminary injunction, which would disrupt internet access for thousands of rural end-user customers of Baicells' customers at a time when such access is especially critical to performing basic daily activities including remote work, remote school work, and telemedicine.

For all the foregoing reasons, LigTel's Motion should be denied.

Respectfully submitted,

ICE MILLER LLP


*/s/  Adam Arceneaux*
Adam Arceneaux, Attorney No. 17219-49
Eric J. McKeown, Attorney No. 27597-49
Jessa DeGroote, Attorney No. 358487-49

***Attorneys for Defendants, Baicells Technologies Inc. and Baicells Technologies North America, Inc.***

One American Square
Suite 2900
Indianapolis, IN  46282-0200
Phone:  (317) 236-2100
Fax:    (317) 236-2219
Adam.Arceneaux@icemiller.com


## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system:


*/s/ Adam Arceneaux*
Adam Arceneaux, Attorney No. 17219-49

ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN  46282-0200
Adam.Arceneaux@icemiller.com