**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| LIGTEL COMMUNICATIONS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NUMBER:  1:20-CV-37-HAB |
| | ) |
| BAICELLS TECHNOLOGIES, INC. AND | ) |
| BAICELLS TECHNOLOGIES OF NORTH | ) |
| AMERICA, INC., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**OPINION AND ORDER**

LigTel Communications Inc. ("LigTel") sued Baicells Technologies, Inc. and Baicells Technologies North America, Inc. (collectively, "Baicells") for false designation of origin and false or misleading representations under the Lanham Act, 15 U.S.C. § 1125(a), and its Indiana counterpart. (Compl. ¶¶ 45–73, ECF No. 1.) Additionally, it has alleged claims for misappropriation of trade secrets pursuant to the Defense of Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq.* and the Indiana Uniform Trade Secrets Act ("IUTSA"), Ind. Code § 24-2-3-3. (Compl. ¶¶ 74–93).  LigTel seeks injunctive and monetary relief as is evidenced by its Motion for Preliminary Injunction (ECF No. 4) filed contemporaneously with its Complaint. Baicells filed an Answer denying the Complaint's allegations and opposing the request for injunctive relief. (Answer, ECF No. 29.) The parties have engaged in expedited discovery, submitted pre-hearing briefs along with affidavits and exhibits (ECF Nos. 35, 36, 37, and 38) and argued the preliminary

injunction motion to the Court.[1] Having reviewed all these materials, and for the reasons stated below, LigTel's request for Preliminary Injunction will be DENIED.

## FACTUAL BACKGROUND

With few exceptions, which shall be identified herein, the parties' accounts of the underlying factual allegations giving rise to this case do not widely differ. As will be identified throughout the Discussion, it is the legal import and/or inferences to be drawn from these factual allegations that are disputed.

### A.  **The Parties**

LigTel, founded as the Ligonier Telephone Company in 1896, is a family-owned company that serves some 1,500 wireless service customers across seven counties in northeastern Indiana. (Compl. ¶ 2.)  LigTel "provides broadband internet, television, and wireless telephone service" to these wireless service customers and thus, functions as a wireless Internet Service Provider ("ISP"). (ECF No. 35-2, Interrogatory 4.) LigTel "advertises, promotes, and markets its wireless services . . . through websites, print, and other media" within the Indiana market it services. (*Id.*)

BaiCells manufactures and sells Long-Term Evolution ("LTE") wireless broadband equipment to operators of wireless networks.  (Decl. of Jesse Raasch ¶ 5, ECF No. 35-6.)[2] Baicells does not operate commercial LTE wireless networks nor does it provide internet service or mobile phone services to its customers. (*Id.* ¶ 6.) They are, in essence, equipment vendors that provide

---

[1] Beginning on March 17, 2020, the Northern District of Indiana issued a series of General Orders in response to the recent outbreak of Coronavirus Disease 2019 (COVID-19) in the United States and in the Northern District of Indiana.  See N.D. Ind. General Orders 2020-05 through 2020-10. Among other things, these General Orders limit in-person proceedings and closed Court facilities to the public due to the health and safety risks associated with COVID-19.  In light of these orders, on March 24, 2020, the Court held a status conference wherein the parties agreed to convert the in-person preliminary injunction hearing to a telephonic hearing. (ECF Nos. 31, 32). The parties also agreed to submit their evidentiary record for the Preliminary Injunction Motion in the form of affidavits and exhibits rather than live testimony.  The Court conducted that telephonic hearing on April 15, 2020.

[2] Raasch is the Chief Technology Officer and Vice President, Emerging Business at Baicells.

LTE service equipment and LTE core solutions to wireless ISPs that are in the same business as LigTel. (Compl. ¶ 12.) To that end, Baicells has about 544 wireless ISP customers, many of whom serve customers and end users in rural communities.

### B. **The Technology**

This case involves the inner workings of wireless mobile devices, computers, and equipment. Every LTE device that provides broadband in the United States has a unique fifteen-digit number, commonly referred to as an International Mobile Subscriber Identity ("IMSI"). (Decl. of Josh Wentworth ¶ 2, ECF No. 36-37; Decl. of Randy Mead ¶3, ECF No. 36-24.)[3] An IMSI is used in any mobile network that interconnects with other networks. Each device's IMSI is stored in its Subscriber Identity Module ("SIM"), which is a removable card found in the device. (Raasch Decl. ¶ 16.)

An IMSI includes three components: (1) a three-digit Mobile Country Code (MCC); (2) a three-digit Mobile Network Code (MNC); and (3) a nine-digit Mobile Station Identification Number (MSIN). (Wentworth Decl. ¶ 2; Raasch Decl. ¶ 18.) The first six digits of an IMSI are comprised of the MCC and the MNC and, in combination, they are known as the Home Network Identity code ("HNI code") or Public Land Mobile Network code ("PLMN code"). (*Id.*; Mead Decl. ¶ 3.) The HNI code identifies the carrier to which a wireless customer subscribes. (Wentworth Decl. ¶ 2; Mead Decl. ¶ 3.) The remaining digits identify the particular device used by the wireless customer. All HNI codes utilized in the United States are six digits, beginning with 310, 311, 312, 313, 314, 315, or 316. (Wentworth Decl. ¶¶ 3, 7; Mead Decl. ¶ 4; IMSI Guidelines §3.9: HNI codes are "a fixed 6-digit length in the United States.") Other countries use five-digit codes. (Mead Decl. ¶ 4.)

---

[3] Wentworth is LigTel's Network Operations Supervisor. (Wentworth Decl. ¶ 1.) Mead is the CEO and General Manager for Ligtel. (Mead Decl. ¶ 3.)

The IMSI Oversight Council ("IOC"), a committee of the Alliance for the Telecommunications Industry Solutions ("ATIS"), governs the assignment and administration of HNI codes. (Wentworth Decl. ¶ 4.) In the United States, iconectiv acts as the IMSI administrator managing HNI codes. (*Id.*) ATIS prescribes a publicly-available process for applying for an HNI code. (IMSI Guidelines ¶ 6.) Applicants meeting the criteria for assignment of an HNI code must pay annual fees, efficiently manage the code, and participate in IMSI audits. (*Id.*) All HNI codes registered and assigned in the United States are identified and listed on the IMSI administrator's website. (Mead Decl. ¶ 4.) ATIS also offers a voluntary, non-binding dispute resolution process related to HNI codes. (Wentworth Decl. ¶ 32.)

### 1. LigTel's HNI Code and its LTE Network Deployment

In 2001, LigTel applied to ATIS for an HNI code and was assigned the code 311980. (Mead Decl. ¶ 6.) LigTel annually pays the maintenance fee and is in good standing with the HNI administrator. (*Id.*)

In 2012, LigTel upgraded to an LTE network to incrementally increase its network speed over existing 3G networks. (Mead Decl. ¶ 8; Wentworth Decl. ¶ 13.) At that time, LigTel deployed an LTE core manufactured by Huawei, a global provider of telecommunications equipment. (Mead Decl. ¶¶ 8–9; Wentworth Decl. ¶¶ 13–16.) To facilitate LigTel's new LTE network deployment, LigTel and Huawei entered into non-disclosure agreements so that LigTel could safely share its proprietary and sensitive information to Huawei. (Wentworth Decl. ¶¶ 13, 16–18.) Ronald Mao ("Mao"), whose relevance will be discussed *infra*, was an employee of Huawei from November 2005 until June 2017. (Decl. of Ronald Mao ¶ 11, ECF No. 35-5.)

2. __Baicells' Founding and Use of Code 31198__

In 2014, two former employees of Huawei founded Baicells. (Compl. ¶¶ 27, 29.) In November 2015, research and development engineers for Baicells in China adopted the HNI/PLMN code 31198. (Raasch Decl. ¶ 12.) The first three digits represent a country code for the United States. (*Id.*) The remaining two digits appear to be randomly selected.[4] Baicells utilizes the HNI code 31198 on equipment identified as "eNodeB." "An 'eNodeB' is an LTE term that refers to the base station that facilitates wireless communication between an operator network and end-user equipment," such as computers or a mobile device. (*Id.* ¶ 14.) Baicells eNodeBs broadcast the HNI/PLMN code 31198 to enable connection to Baicells' CloudCore Evolved Packet Core ("EPC"). The EPC was also programmed to use HNI/PLMN code 31198.

The HNI/PLMN code 31198 is also found in the SIM cards that reside on end-user devices that connect to networks operated by Baicells' customers. As noted *supra*, the IMSI number embedded on an end-user SIM card consists of the HNI/PLMN code along with an MSIN. (Raasch Decl. ¶ 17.) When viewed on the card, the IMSI is a string of numbers. However, "when the IMSI is coded on a SIM card, the MCC, the MNC, and the MSCIN are each coded separately." (*Id.*) This results in Baicells PLMN of 31198 encoded as 0x13F189, whereas LigTel's HNI code of 311-980 is encoded as 0x139108. "This difference in coding means that the SIM cards utilized by end users of Baicells network-operator customers will not be mistakenly recognized as residing on the LigTel network and will not be able to gain unauthorized access to LigTel's network." (*Id.* ¶ 19.)

C.  __LigTel Learns of Baicells Use of 31198__

---

[4] During oral argument, the Court inquired as to the source of the last two digits in Baicells' selection of its code. Baicells' counsel had no explanation as to how or why these numbers were selected.

On June 21, 2019, Wentworth was contacted by email by Jeff Brown ("Brown") at Viaero Wireless ("Viaero"), a wireless ISP in northeast Colorado, about possible interference caused by a carrier appearing to use LigTel's HNI code in Nebraska. (Wentworth Decl. ¶ 19; ECF No. 36-46 (confirming email).) Viaero's contention that LigTel was interfering with its network flummoxed Wentworth since LigTel has never conducted any business in either Colorado or Nebraska. (Wentworth Decl. ¶ 19.) A few days later, on June 26, 2019, Brown contacted Wentworth again and informed him that equipment from Sandhills Wireless ("Sandhills") in Nebraska was transmitting a signal appearing to be LigTel's because the equipment had HNI code 31198. (*Id.*; ECF No. 36-47, Viaero email identifying Sandhills equipment with PLMN 31198; Mead Decl. ¶ 12: "Wentworth … informed me that Sandhills … was using an HNI code that appears to the world to be LigTel's HNI code.") Wentworth advised Brown that LigTel did not provide any services in Nebraska. Subsequently, on June 28, 2019, LigTel sent a cease and desist letter to Sandhills demanding that it cease its use of HNI code 311-980. (*Id.* ¶ 25.)

On July 2, 2019, Wentworth contacted Sandhills, which confirmed it was using Baicells equipment and that the SIM cards issued to its end users contained IMSI numbers that start with 311980. (Wentworth Decl. ¶ 24.) Sandhills indicated concern about this issue and, on July 3, 2019, LigTel granted Sandhills a limited right to use LigTel's HNI Code 311-980. (*Id.* ¶ 25.)

Wentworth continued to investigate what he believed to be "unauthorized use" of LigTel's HNI Code by contacting other entities in the industry that utilized Baicells equipment. (Wentworth Decl. ¶ 26.) Mead and Wentworth contacted New Lisbon Broadband and Communications ("New Lisbon"), an Indiana company utilizing Baicells equipment, and learned that, it too, was utilizing HNI code 31198 and that Baicells had directed it to do so. (*Id.*) Mead informed New Lisbon that

the HNI code they were using was not a valid code, that it appeared to be LigTel's HNI code, and that Baicells was not authorized to use LigTel's HNI code. (Mead Decl. ¶ 13.)[5]

### 1. LigTel Contacts Baicells, Baicells Applies to ATIS for a New Code

On July 12, 2019, Wentworth contacted Rick Harnish ("Harnish"), Baicells' Director of WISP Markets in North America,[6] regarding Baicells' perceived unauthorized use of LigTel's HNI code, and the two agreed to a physical meeting between the companies in Ligonier, Indiana, on July 29.

Before Wentworth contacted Harnish, Harnish had been made aware by Sandhills that LigTel had sent a cease and desist letter to Sandhills. (Decl. of Rick Harnish ¶ 7, ECF No. 35-4.) Sandhills updated Harnish on the situation with Viaero, wherein Viaero claimed it was "receiving spectrum interference in the 3.65-3.70 GHz shared spectrum band from someone using LigTel's HNI code of 311-980." (Harnish Decl. ¶ 8.) New Lisbon had also contacted Harnish to inquire about Baicells equipment and SIM card IMSI numbers. (*Id.* at ¶ 10.)

These contacts prompted Baicells to file, on July 22, 2019, an application with ATIS and iconectiv to obtain a new PLMN/HNI code. (Harnish Decl. ¶ 12.) On July 29, the same day as the planned meeting between LigTel's and Baicells' officials, ATIS assigned HNI code 314-030 to Baicells.

### 2. July 29, 2019, Meeting

Representatives of Baicells and LigTel met as planned on July 29, 2019. Harnish, along with Bo Wei ("Wei"), Baicells' President and Chief Executive Officer, and Mao, Director of

---

[5] Mead avers that he discussed the agreement reached with Sandhills with New Lisbon officials. Ultimately, LigTel did not send a cease and desist letter to New Lisbon because it was "trying to work in good faith with a fellow Indiana Company." (Mead Decl. ¶ 13.)

[6] Since November 2019, Harnish holds the position of Chief Marketing Officer of Baicells.

Carrier Solutions, attended this meeting on Baicells' behalf. (Harnish Decl. ¶ 15; Mao Decl. ¶ 5; Declaration of Bo Wei ¶ 5, ECF No. 35-7.) For its part, LigTel had Mead, Wentworth, and Mike Troup, Network Operations Manager and Marketing in attendance. LigTel's outside legal counsel was also present. (Wentworth Decl. ¶ 29; Mead Decl. ¶ 15.) At the meeting, Baicells took the position that it was not utilizing the same HNI/PLMN code as LigTel since Baicells' code was 31198 and not 311-980. (Wei Decl. ¶ 11.)

LigTel presented Baicells with two options to resolve their dispute. Option 1 required Baicells to immediately discontinue use of 31198 and change to a new HNI code. (Harnish Decl. ¶ 20; Wei Decl. ¶ 12; Mao Decl. ¶ 10.)[7] The second option involved some version (the parties' explanations vary) of LigTel transferring its HNI code to Baicells in exchange for a fee to cover LigTel's costs to migrate future customers to a new HNI code. This option also involved the possibility of a secondary use license. (Harnish Decl. ¶¶ 20–21; Mead Decl. ¶ 19; ECF No. 35-5.)

Once the options were presented, the parties reached an impasse. To end this stalemate, Wei asked Mead to meet privately with him outside the presence of the other attendees to discuss the options. (Wei Decl. ¶ 16; Mead Decl. ¶ 21.) During this sidebar meeting, Wei offered to pay $100,000 to LigTel to obtain LigTel's HNI code and would then, in turn, grant LigTel a secondary use license to use that code. (*Id.*) Wei also offered to extend discounts to LigTel on Baicells' equipment. (Wei Decl. ¶ 17.) Mead declined that offer as he was concerned that there would continue to be confusion, interference issues, and public safety issues with both entities using the same code. (*Id.*; Mead Decl. ¶ 21.)

It is at this point in their private conversation that the parties' accounts substantially diverge. Mead avers that Wei told him that Huawei had manufactured LigTel's core and that Mao

---

[7] Mao took contemporaneous minutes of the meeting (ECF No. 35-5) and transmitted them by email to Wei and Harnish the same day.  These notes further reflect the two options that were discussed at the meeting.

formerly worked at Huawei. (Mead Decl. ¶ 22.) Mead states that Wei offered to have Mao "get into" LigTel's Huawei manufactured core and reprogram it himself to save the parties the cost of reprogramming. (*Id.*) Mead understood Wei's offer to mean "that Baicells had the ability to access LigTel's network and reprogram LigTel's core." (*Id.* ¶ 23.) Mead further interpreted Wei's statement to mean that "Baicells acquired and had access to LigTel's trade secrets (including LigTel's encryption code and network architecture)." (*Id.*) For his part, Wei avers that these statements attributed to him during the meeting are "patently false" and he "never said or intimated any such thing to Mead or to anyone else." (Wei Decl. ¶ 18.) Wei and Mead rejoined the meeting without any resolution of the issues.

### 3. Baicells Initiates Migration Plan and LigTel Engages ATIS for Assistance

As set out, *infra*, Baicells had obtained the HNI code 314-030 from ATIS and iconectiv before the July 29, 2019, meeting. On August 21, 2019, LigTel's counsel contacted ATIS to activate its voluntary dispute resolution process and to request formal action from ATIS and the IOC. (Mead Decl. ¶¶ 27–28.) Specifically, LigTel requested that the IOC direct Baicells to immediately cease and desist from using HNI code 31198 or 311980 within any portion of its operations. (Mead Decl. ¶ 28; ECF No. 36-35 at 3: "LigTel believes a directive from the IOC for Baicells to immediately cease and desist from its unauthorized use of the HNI 311-980 or any substantially similar network identification code . . . is an appropriate remedy in this instance.")

On September 12, 2019, Wei submitted the Baicells PLMN Migration Plan ("the Plan") to the IOC to be shared at the IOC meeting on September 20, 2019. (Wei Decl. ¶ 23.) Wei further informed the IOC that Baicells intended to begin the transition to HNI code 314-030 in November 2019 and complete all migrations within six to nine months of that date. (*Id.* ¶ 23; ECF No. 35-7, Ex. 1.)

On September 20, 2019, Wei participated in a telephonic meeting of the IOC to discuss the Plan and LigTel's comments about the Plan. (Wei Decl. ¶ 24; ECF No. 35-7, Ex. 2.) During this meeting, the IOC reviewed and agreed upon the Plan subject to any additional feedback submitted by September 27, 2019. (Wei Decl. ¶ 24.) LigTel reiterated its request "that the IOC direct Baicells to immediately cease and desist from using HNI code 311980 or any substantially similar network identification code … within any portion of its operations" (Mead Decl. ¶ 28) and Baicells responded (Wei Decl. ¶ 25).

On November 6, 2019, Wei participated in a follow-up telephonic meeting with the IOC together with Andy Yang, Baicells' Director of Engineering and Support, Baicells' outside counsel, and members of LigTel and/or their counsel. (Wei Decl. ¶ 26.) At this meeting, the IOC reviewed an ATIS summary of the Plan, and Baicells agreed to provide periodic progress reports to the IOC. Baicells, to date, has provided monthly progress reports as agreed upon during this conference.[8]

Baicells is scheduled to complete the Plan migration to the new PLMN/HNI code 314-030 by July 1, 2020. (Suppl. Decl. of Harnish ¶ 3, ECF No. 37-2.) Once the Baicells migration is complete, all network operators who are Baicells customers will broadcast the HNI code 314-030. (Harnish Decl. ¶ 42.) More specifically, on July 1, 2020, Baicells "will retire the original CloudCore EPC environment using PLMN/HNI code 31198." (Suppl. Harnish Decl. ¶ 5.) Baicells' customers who have not upgraded to Baicells' new firmware as of that date will risk going offline. (*Id.*) To avoid this consequence and the corresponding loss of wireless services by the end users of Baicells equipment, on March 18, 2020, Baicells publicly announced and encouraged its customers to upgrade their software prior to the July 1 date. (*Id.*)

---

[8] This representation was made to the Court by counsel during oral argument.  Reports were filed on January 20, February 20, March 18, and April 15.

LigTel continues its opposition to the Plan migration asserting that it is "not adequate," does not have a binding and detailed timeline of when Baicells will cease using LigTel's HNI code, and does not replace SIM cards on devices for existing end-users serviced by Baicells' customers. Mead states that he "lack[s] confidence that the ATIS process will adequately resolve the HNI code issues" and he does "not believe that Baicells has any good faith intention to stop using LigTel's HNI code." (Mead Decl. ¶¶ 30, 33.)

### D. **Mao's Alleged Possession of LigTel's Trade Secrets**

When LigTel upgraded to an LTE network in 2012, it engaged Huawei to assist in that upgrade. (Wentworth Decl. ¶ 16.) So Huawei could configure the LTE core, LigTel provided Huawei with confidential and sensitive information about its network under the terms of a non-disclosure agreement. (*Id.* ¶¶ 16–17: "I know from my work that the trade secrets that LigTel provided Huawei included radio frequency configurations, IP infrastructure . . . network engineering and architecture, the technologies LigTel employed to connect its networks, and LigTel's encryption code.")

Mao worked for Huawei in 2012 during LigTel's upgrade to an LTE Network. (Mao Decl. ¶ 11.) In 2015–2016, Huawei assigned Mao to provide sales support for multiple Huawei accounts, including LigTel. (Mao Decl. ¶ 12.) At that time, LigTel had already purchased and installed Huawei equipment for its LTE network conversion (*Id.* ¶ 13) and Mao considered his role with LigTel to be "maintenance" rather than that of a salesperson (*Id.* ¶ 16). Mao avers that he was not involved, "in the design, configuration, sales, or installation of any equipment that LigTel purchased from Huawei." (*Id.* ¶ 14.) Additionally, Mao states that he "never visited any of LigTel's facilities, locations, or sites, nor did I see any of its equipment, network, or operations." (*Id.*) While employed at Huawei, Mao avers that he did not have access to LigTel's encryption code, IP

infrastructure, software, or systems, although he had general knowledge of LigTel's tower locations, radio frequency information, and wireless coverage areas. (*Id.* ¶¶ 17–18.)

Mead, however, avers that Mao's involvement with LigTel's LTE core during his employment with Huawei was more involved than Mao acknowledges. For instance, he asserts that Mao "worked on maintaining and expanding LigTel's equipment after the initial installation" and "had access to all of the confidential trade secrets that LigTel shared with Huawei and was subject to the non-disclosure agreements." (Mead Decl. ¶ 16.)

Mao left his employment with Huawei in June 2017 due to a reduction in force. (Mao Decl. ¶ 20.) Upon his departure from Huawei, Mao left his laptop and all work-related documents and information with Huawei and did not retain copies of any documents or information. (*Id.*)

In January 2018, Baicells hired Mao as the Director of Carrier Solutions. (Mao Decl. ¶ 3.) Since leaving Huawei, Mao has not had "possession of or access to any documents or information that LigTel alleges to be its confidential or trade secret information including, but not limited to: LigTel's encryption code; network architecture, design, and engineering; or the operational layout of LigTel's equipment, core, and servers. (*Id.* ¶ 23.)

Mao participated in the July 29, 2019, meeting between Baicells and LigTel officials. It is at this meeting that Mead avers that Wei offered to have Mao "get into" LigTel's system to reprogram it (Mead Decl. ¶ 22) and Mead interpreted this to mean that Baicells had acquired LigTel's trade secrets. As noted, Wei denies making that statement or anything similar to it. In response, Mao states that he has "no ability to 'get into' LigTel's core and reprogram it." (Mao Decl. ¶ 25.) Mao admits that he did have some memory of some communications with LigTel which he summarized in an email dated July 11, 2019, to his coworkers at Baicells. (Mao Decl. ¶

21; ECF No. 35-5, Ex. 2.) This email does not appear to disclose any of the trade secret information LigTel asserts Mao and Baicells have.

Relying upon these facts, LigTel seeks a preliminary injunction requiring Baicells to immediately cease utilizing the HNI code 31198 or 311-980, and to cease misappropriating its trade secrets.

## DISCUSSION

"A district judge asked to decide whether to grant or deny a preliminary injunction must choose the course of action that will minimize the costs of being mistaken." *Am. Hosp. Supply v. Hosp. Prods. Ltd.*, 780 F.2d 589, 593 (7th Cir. 1985). Indeed, "[a]n equitable, interlocutory form of relief, a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Valencia v. City of Springfield*, *Ill.*, 883 F.3d 959, 965 (7th Cir. 2018) (internal quotation marks omitted). "It is never awarded as a matter of right." *Id.* (internal quotation marks omitted). Further, "[a] preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved. *Ind. Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001).[9]

When faced with a motion for preliminary injunction, the court conducts an analysis with two phases: "a threshold phase and balancing phase." *Valencia*, 883 F.3d at 965 (quotation marks omitted). At the threshold phase, the party seeking the preliminary injunction must make three

---

[9] LigTel acknowledges that its request for injunctive relief does not seek to extend the status quo. Rather, it would affirmatively require Baicells to expedite its migration plan. (Hr'g Tr. 24, ECF No. 42.) Where a plaintiff seeks an injunction, not to maintain the status quo pending resolution of the case, but to obtain affirmative relief, the plaintiff's burden is more difficult. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *see also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1259 (10th Cir. 2005) (identifying three types of disfavored preliminary injunctions "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of the trial on the merits"). The parties do not address this issue in their briefing and, thus, the Court will not dwell on the distinction here as it finds that LigTel does not meet even a lighter standard for injunctive relief.

showings: (1) its claim has some likelihood of succeeding on the merits; (2) absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to the final resolution of its claims; and (3) traditional legal remedies would be inadequate. *Id.*!

If the moving party clears these hurdles, the court continues to the balancing phase where it must then weigh the irreparable harm the non-moving party will suffer if the injunction is granted against the irreparable harm the moving party will suffer if the injunction is denied, and the public interest, i.e., the effect that granting or denying the injunction will have on non-parties. *Id.*; *see also Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1067 (7th Cir. 1994); *Wis. Music Network v. Muzak Ltd.*, 5 F.3d 218, 221 (7th Cir. 1993). With these factors in mind, the Court now turns to an analysis of the Plaintiff's request for a preliminary injunction.

### A. Plaintiff's Likelihood of Success on the Merits

LigTel's Complaint seeks relief under the federal Lanham Act, 15 U.S.C. §1125(a), and the Defense of Trade Secrets Act, 18 U.S.C. §1836, as well as Indiana's state law counterparts to these statutes. To survive the first threshold phase to obtain the preliminary injunctive relief, LigTel must show that its chances to succeed on the merits are "better than negligible." *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016) ("[T]he threshold for demonstrating a likelihood of success on the merits is low. . . In framing the probability of success necessary for a grant of injunctive relief, we have said repeatedly that the plaintiff's chances of prevailing need only be better than negligible."); *Hoban v. Wexford Health Sources, Inc.*, 731 F. App'x 530, 532 (7th Cir. 2018) (holding that the "better than negligible" standard applies). While this is a low threshold, for the reasons set out below, the Court concludes that LigTel has not met its burden with respect to any of its claims.

### 1. Claims under the Lanham Act

"Congress passed the Lanham Act in 1946 to 'federalize' existing common law protection of trademarks used in interstate commerce." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 672 (7th Cir. 2001) (quoting *Peaches Entm't Corp. v. Repertoire Assocs., Inc.*, 62 F.3d 690, 692 (5th Cir. 1995)). "That law broadly prohibits uses of trademarks, trade names, and trade dress that are likely to cause confusion about the source of a product or service." *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 428 (2003).

Relevant here, § 43(a) of the Lanham Act imposes liability upon a defendant who "on or in connection with any goods or services . . . uses in commerce any . . . false designation of origin, false or misleading description of fact, or false or misleading misrepresentation of fact, which is likely to cause confusion or to cause mistake, or to deceive as to the . . . origin, sponsorship, or approval of his or her goods [or] services . . . by another person." 15 U.S.C. § 1125(a)(1). LigTel asserts two types of Lanham Act claims against Baicells under this provision: one for false designation of origin and the other for false or misleading statements.

To prevail on either of its claims under the Lanham Act, LigTel must establish that (1) its mark is protectable, and (2) the defendant's use of the mark is likely to cause confusion among consumers." *Packman v. Chi. Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001). However, "a court doesn't even reach the question of likelihood of confusion until persuaded that the putative mark is sufficiently distinctive to warrant prima facie protection as a trademark." *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 610 (7th Cir. 1986).

A plaintiff can allege that it has a protectable mark in several ways: (1) alleging that the mark is registered with the United States Patent and Trademark Office; (2) alleging that the mark is registered in the Supplemental Register; or (3) alleging that the mark, although unregistered, is

entitled to protection under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[10] *Top Tobacco v. Fantasia Distrib. Inc.*, 101 F. Supp. 3d 783, 788 (N.D. Ill. 2015); *see also KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1013 (N.D. Ill. 2014). Here, LigTel does not assert or provide any evidence that it has registered HNI code 311-980 with either the USPTO or with the Supplemental Register.  Thus, it relies on the third option and must establish "use" of the mark "in commerce," as that phrase is defined in the Lanham Act. *Aaron MacGregor & Assocs., LLC v. Zhejiang Jinfei Kaida Wheels Co.*, 328 F. Supp. 3d 906, 923–24 (N.D. Ind. 2018); *Purepecha Enters., Inc. v. El Matador Spices & Dry Chiles*, No. 11 C 2569, 2012 WL 3686776, at *9 (N.D. Ill. Aug. 24, 2012) (citations omitted).

"Use in commerce" is statutorily defined as "use of a mark in the ordinary course of trade." 15 U.S.C. § 1127. However, the statute expands this definition by identifying two ways in which a mark is "used in the ordinary course of trade." In the context of goods, "use in commerce" may occur by placing the mark on the goods. Or, in the context of services, "use in commerce" is shown by using or displaying the mark in the sale or advertising of the services when the services are rendered in commerce. *Id.*

Here, Baicells argues that LigTel cannot satisfy the "use in commerce" requirement because it neither uses nor displays its HNI code in the actual sale or advertising of its services to its consumers. Rather, it advertises wireless services without any specific reference to its HNI code. Thus, LigTel consumers are not relying on the mark to "identify LigTel and distinguish its goods and services from those of its competitors."  *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). Indeed, a plaintiff must show "use in a way

---

[10] Registration is prima facie evidence of a valid, protectable mark. *Promatek Indus., LTD v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002).

sufficiently public to identify or distinguish the marked goods [or services] in an appropriate segment of the public mind as those of [the adopter of the mark.]." *Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 434 (7th Cir. 1999).

Factually, Baicells supports this argument by referencing LigTel's response to Baicell's interrogatory request wherein Baicells specifically requested LigTel to "identify and describe . . . any advertisements, promotional material, and/or marketing material . . . in which LigTel is using, has used, or plans to use the LigTel HNI Code." (ECF No. 35-2 at 6.) LigTel responded as follows: "LigTel advertises, promotes, and markets its wireless services, which use LigTel's HNI code, through websites, print, and other media." (*Id.* at 7.) According to Baicells, this response falls short of meeting the "use in commerce" requirement because LigTel admits that the mark itself, HNI code 311-980, is not used in any advertising or marketing materials for its services; instead, the HNI code technology is used in the services provided.

For its part, LigTel initially glosses over this point in its pre-hearing brief, asserting in a footnote that it only needed to use the mark in connection with its business to qualify it as a protectable mark. (ECF No. 36-1, n. 1: "LigTel's HNI Code is a protectable mark . . . because LigTel uses it in connection with its business and LigTel is publicly identified with and distinguished b[y] that code.") However, later, it asserts that the mark only need "identify LigTel to 'some segment' of the public as the adopter of the mark." (LigTel's Pre-Hr'g Resp. Br. at 10, ECF No. 38-1 at  9 (citing *Johnny Blastoff*, 188 F.3d at 433–34).) Additionally, LigTel argues that because it is listed elsewhere, such as on the iconectiv website, as the assignee of HNI code 311-980, this is sufficient to identify it publicly and to demonstrate a protectable mark.

There is no question that LigTel does not show or display HNI code 311-980 in its advertising in commerce. LigTel indicates only that the HNI code is used in the services it provides

to its consumers. As Baicells points out, the HNI code is imbedded internally within the equipment LigTel provides to its consumers and, while the code itself is assigned to LigTel by ATIS/iconectiv and used as part of the inner workings of its network, there is simply no demonstration by LigTel that its consumers rely on HNI 311-980 to "identify and distinguish" LigTel's services from the services of other internet service providers. In fact, the HNI code is neither visible nor meaningful to the average user of wireless internet services. To the extent the HNI code would ever be visible, it would appear as a random group of numbers. Those users would have no knowledge whatsoever of what an HNI code is, how it is used in the technology, or how it affects the services rendered much less be able to associate it with a particular service provider.

Thus, LigTel has failed to establish it uses its HNI code "in commerce" so as to make it a protectable mark under the Lanham Act and, in turn, has not demonstrated a "better than negligible" chance of succeeding on its Lanham Act claims. Indeed, as stated above, in the absence of a protectable mark, the Court need not reach the question of whether another's use of that code or one similar to it could cause a likelihood of consumer confusion. *See Blau Plumbing, Inc.*, 781 F.2d at 610 ("[A] court doesn't even reach the question of likelihood of confusion until persuaded that the putative mark is sufficiently distinctive to warrant prima facie protection as a trademark"); *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings. Inc.*, 696 F.3d 206, 216–17 (2d Cir. 2012).[11]

---

[11] Even if the Court were to consider the likelihood of confusion, that is a "factual determination" based on an "equitable balancing test." *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000). Courts generally examine seven factors: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the complainant's mark; (6) actual confusion; and (7) intent of defendant to palm off his product as that of another. *Id.* at 1043–44 (internal quotation marks omitted). No single factor is dispositive, and this Court may assign varying weights to each of the factors, but three factors are considered "particularly important: the similarity of the marks, the defendant's intent, and actual confusion." *Id.* at 1044.

Here, the Court finds that the defendants' intent, or lack thereof, is entitled to substantial weight. During oral argument, the Court inquired from LigTel's counsel what benefit Baicells could possibly derive by using an HNI code

## 2.  **Unfair Competition Under Indiana Law**

The "use in commerce" element is also essential in the analysis of LigTel's unfair competition claims under Indiana law. *See Aaron MacGregor & Assocs., LLC*, 328 F. Supp. 3d at 923–24 (N.D. Ind. 2018) (citing  *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 947 F. Supp. 2d 922, 926 (N.D. Ind. 2013), *aff'd,* 763 F.3d 696 (7th Cir. 2014) ("[I]t is well established that [trademark] infringement, federal unfair competition, and state unfair competition . . . are analyzed under the same trademark infringement analysis."); *Ind. Cheer Elite, Inc. v. Champion Cheering Org., LLC,* No. 3:05–CV–125, 2005 WL 2219467, at *1 n.1 (N.D. Ind. Sept. 13, 2005) ("The analysis under the Lanham Act for . . . unfair competition also applies to claims for unfair competition under Indiana common law.").  Because the Court concludes that LigTel has not used HNI code in commerce as that term is defined in the Lanham Act, the Court likewise concludes that LigTel has failed to show a likelihood of success on the merits of its unfair competition claim under Indiana law.

## 3.  **Misappropriation of Trade Secrets Under the DTSA and IUTSA**

Next, LigTel asserts it has a likelihood of success on its federal and state claims against Baicells for misappropriation of trade secrets. The DTSA, a relatively recently enacted statutory

---

similar to LigTel's.  Counsel responded that "it's up to Baicells to explain why they would have taken our code" but then speculated, "I think we're a solid company.  We've been in the market a long time. . . . I don't know exactly why they would have taken our code, except our reputation is stellar. I think that to use our code . . . brings an air of goodwill." (Hr'g Tr. 15-16.) This response is entirely speculative and unsupported by anything in the record and even less so by common sense. Baicells and LigTel do not compete in the same market for the same customers; they provide entirely different categories of goods and service. Moreover, when alerted to the issues with its use of code 31198 prior to the July 29 meeting, Baicells applied to ATIS/iconectiv for a new code and began developing a migration plan.

Aside from the absence of intent, the area and manner of concurrent use and the degree of care likely to be exercised by consumers also weigh heavily in favor of Baicells.  Finally, there is scant evidence supporting widespread "actual confusion" by consumers regarding the source of goods or services.  In fact, LigTel can point to only a single incident of confusion.

regime which took effect in 2016, authorizes "[a]n owner of a trade secret that is misappropriated" to bring a civil suit under federal law. Likewise, the IUTSA, Ind. Code. § 24-2-3-1 *et seq.*, codifies and governs claims for misappropriation of trade secrets under Indiana law. The elements of misappropriation claims under the DTSA and IUTSA are similar, *Magnesita Refractories Co. v. Mishra*, Case No. 2:16-cv-542-PPS-JEM, 2018 WL 6435648, at *12 (N.D. Ind. Dec. 7, 2018), and the parties do not argue otherwise in their filings.

Of course, the crux of any trade secrets claim turns upon the identification of a trade secret. 18 U.S.C. § 1836(b)(1). Indeed, "a plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of proving that they exist." *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 759 N.E.2d 239, 245–46 (Ind. Ct. App. 2001) (citation omitted); *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) ("[A] plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition[.]"); *U.S. Gypsum Co. v. LaFarge N. Am., Inc.*, 508 F. Supp. 2d 601, 635 (N.D. Ill. 2007) ("In opposing summary judgment, the party asserting a trade secret must identify the trade secret with sufficient specificity.").

Here, LigTel asserts that its encryption code, its network architecture, and its network engineering are all trade secrets covered by the DTSA and IUTA. In its briefs, Baicells does not dispute that the above information is proprietary and, thus, for purposes of this motion, the Court presumes LigTel's encryption code, network architecture, and network engineering are covered trade secrets under both Acts.

Once a party demonstrates the existence of a trade secret, it then must show misappropriation, that is, either the "acquisition of a trade secret of another . . . by improper means" or the "disclosure or use of a trade secret of another without express or implied consent."

20

18 U.S.C. § 1839(5)(A)–(B); *Homedica Osteonics Corp. v. DJO Glob., Inc.*, No. 1:17-cv-00938-SEB-TAB, 2018 WL 3130969, at *7 (S.D. Ind. Mar. 15, 2018) (noting that both the DTSA and the IUTSA "predicate liability on an act of misappropriation"). ‼

   With respect to misappropriation, LigTel contends that Baicells "appears" to have misappropriated its trade secrets above by acquiring them without authorization. To reach this conclusion, LigTel strings together what it admits are a series of circumstantial facts akin to a conspiracy theory. For instance, it notes that LigTel shared its trade secrets with Huawei in 2012 as part of its deployment of its LTE network. A few years later, in 2014–2015, two Huawei employees founded Baicells which, in turn, sells LTE equipment and services to competitors of LigTel. Add to this cauldron of facts, LigTel's assertion that Mao, who Baicells hired in early 2018 after he left Huawei, had access to its proprietary information while at Huawei, and could potentially (according to Wei) "get into" LigTel's network. [12]

   Even taking all of these facts in tandem, LigTel seemingly falls short of establishing a likelihood of success on its trade secrets claims. First, LigTel does not plausibly show any misappropriation or even threatened misappropriation. Wei's statement offering to have Mao "get into" LigTel's network, although denied by Wei, falls well short of what is needed to succeed on a misappropriation claim. Even if the Court infers from Wei's alleged statement that Baicells

---

[12] At oral argument, the Court pressed LigTel's counsel as to what evidence there is that anyone with Baicells actually misappropriated any of its trade secrets. Counsel responded as follows:

> It is admittedly circumstantial, but we think that to make it appear as though they have this information. And the way that happened is that a company called Huawei – LigTel worked with a company called Huawei to build a network. LigTel gave those three types of trade secrets to Huawei, subject to a non-disclosure agreement. Huawei build the LigTel network, which was the first in the United States, the first LTE network.
>
>    After that, 2 of Huawei's employees left to found Baicells to compete with Huawei in the United States to provide exactly these types of networks…

(Hr'g Tr. 12.)

possessed LigTel's proprietary information, "mere possession of trade secrets does not suffice to plausibly allege disclosure or use of those trade secrets." *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020); *Indus. Packaging Supplies, Inc. v. Channell*, No. 18-CV-00165, 2018 WL 2560993, at *2 (N.D. Ill. 2018) (holding that allegations that the defendants, former employees with access to trade secrets, left for a competitor offering the same services to the same clientele are "not enough to justify [the plaintiff's] otherwise unsupported suspicions that the defendants used or disclosed" trade secrets). Indeed, having had access to trade secrets and misappropriating trade secrets are two entirely different allegations.

Moreover, as the Court pointed out during oral argument, even if it assumes that, as Wei allegedly suggested, Mao was able to somehow "get into" LigTel's system, there is no evidence that Mao would be able to do so without information and assistance from LigTel. Mao expressly denies that he has possession of or access to any documents or information regarding LigTel's trade secrets; and, he avers that he has no ability to access LigTel's core and reprogram it. Thus, at best, LigTel's claims of misappropriation are wholly speculative and do not demonstrate a likelihood of success on the merits.

In sum, the Court concludes that LigTel has failed to demonstrate even a "negligible" likelihood of success on the merits for any of the claims asserted in its Complaint.

**B.  <u>Irreparable Harm for Which There is No Adequate Remedy in the Law</u>**

LigTel's inability to demonstrate a likelihood of success on the merits is, by itself, sufficient to warrant denial of a preliminary injunction. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). However, out of an abundance of caution, the Court shall conflate the remaining elements in the threshold phase of the preliminary injunction

analysis, i.e., whether LigTel can demonstrate irreparable harm that cannot be redressed adequately through monetary damages.

Traditionally, the Seventh Circuit has articulated a presumption of irreparable harm in Lanham Act cases. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002); *see, e.g.*, *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 952 (N.D. Ill. 2018). More recently, however, the Supreme Court called this presumption into question when it rejected the categorical rule that a permanent injunction must issue upon a showing of patent infringement. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391–94 (2006). In *eBay*, the Court stated that in evaluating a request for an injunction after patent infringement had been established, the district court should have applied "the traditional four-factor framework that governs the award of injunctive relief." *Id.* at 394.

Although the Seventh Circuit has not yet directly addressed whether *eBay* applies to requests for injunctions in Lanham Act cases, it has held that "*eBay* governs a motion for a preliminary injunction in a copyright case." *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012). Additionally, district courts within the Seventh Circuit, including this district, have expressed doubt as to whether the Seventh Circuit would reach a different conclusion in cases falling under the Lanham Act. *See Ill. Tamale Co. v. El-Greg, Inc.*, No. 16 C 5387, 2019 WL 4395139, at *19 (N.D. Ill. Sept. 13, 2019) ("This Court sees no reason why the Seventh Circuit would reach a different conclusion in a Lanham Act case."); *Swagway, LLC. V. Hangshou Chic Intelligent Co., Ltd.*, Cause No. 3:16-CV-567-PPS-MGG, 2016 WL 8668495, at *2 (N.D. Ind. Oct. 14, 2016) (noting *Ebay* and declining to apply a blanket presumption and instead looking to the specific facts of the case to determine irreparable harm).[13] For this reason, this Court declines to

---

[13] Moreover, other circuits have held and/or strongly intimated that *eBay* applies in this context. *See, e.g.*, *Salinger v. Colting*, 607 F.3d 68, 78 n.7 (2d Cir. 2010) (extending *eBay* test to "preliminary injunctions in the context of copyright

endorse a blanket presumption and will look with a discerning eye to the facts presented by the parties.

!       To clear the irreparable harm hurdle, "[t]he moving party must demonstrate that he will *likely* suffer irreparable harm absent obtaining preliminary injunctive relief." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) (emphasis added). This requires "more than a mere possibility of harm." *Id.* at 1045; see *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*; *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020).

LigTel sets forth three ways in which it believes it is currently being harmed and will continue to be harmed as a result of Baicells' use of HNI code 31198.  First, it asserts that when companies such as Viaero have an interference issue and believe the source of the interference is LigTel, it makes LigTel "look like a bad actor."  (Hr'g Tr. 7.) Along these same lines, LigTel's second assertion is that Baicells actions make "LigTel look like it doesn't follow the applicable rules and guidelines that apply to service providers."  (*Id.* a 6; LigTel Pre-Hr'g Br. at 13: ("Baicells also makes it appear that LigTel does not comply with international and industry-imposed rules, and creates an impression that LigTel cannot properly manage its network.") Taken together, LigTel argues that these two issues "make it more difficult for LigTel to interface with other providers" (*Id.*), and thus, damage its goodwill and reputation.  Lastly, LigTel asserts that Baicells

---

cases" and noting it saw "no reason that *eBay* would not apply with equal force to an injunction in any type of case"); *Ferring Pharm., Inc. v. Watson Pharm., Inc*., 765 F.3d 205, 214 (3d Cir. 2014) ("We hold that although *eBay* in particular arose in the patent context, its rationale is equally applicable in other contexts, including cases arising under the Lanham Act); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013);  *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227 (11th Cir. 2008) ("[A] strong case can be made that *eBay's* holding necessarily extends to the grant of preliminary injunctions under the Lanham Act.").

use of HNI code 31198 "may cause law enforcement to seek information from LigTel about individuals who appear to be LigTel subscribers, when in fact they are not." (LigTel Pre-Hr'g Br. at 13). LigTel claims that this harms LigTel's reputation with law enforcement.

Addressing these items in reverse order, LigTel has failed to offer any evidence whatsoever that its reputation with law enforcement has been or has a likelihood of being damaged in the future as a result of Baicells current use of 31198. In his declaration, Mead indicates that it is his "understanding that law enforcement is able to identify a suspect or target's cellular service provider based on the customer's IMSI code."  (Mead Decl. ¶ 32.)  In turn, he speculates that law enforcement would not be able to identify the network to which a suspect subscribed without reference to an HNI code and that this creates a risk to public safety.

In response, Baicells points out that documents produced by LigTel demonstrate that law enforcement officials rely upon an Internet Protocol ("IP") address to track criminal activity. Additionally, Baicells submits the Supplemental Declaration of Raasch (ECF No. 37-4) wherein he avers as follows:

> I am aware of instances in which Baicells customers have received requests from law enforcement to obtain the identity of end users suspected of criminal activity. In each such request that I am aware of, law enforcement has identified the… IP… address of a suspect and has requested the identity of the end user assigned to that IP address. In my experience, law enforcement officials do not rely on IMSI numbers to identify individuals. Instead, they rely on IP addresses, which do not contain an HNI/PLMN code.

(Suppl. Raasch Decl. ¶ 24.)

What all of this back and forth translates into is that LigTel's assertion that it is suffering, it is likely to suffer, or it is possible that it might suffer some harm to its reputation from law enforcement is just that, potential and speculative. Indeed, to the extent harm exists, it is pure conjecture by LigTel, generalized and entirely conclusory. Moreover, "a speculative fear of injury

is not a ground for an injunction." *Wright v. Miller*, 561 F. App'x 551 554 (7th Cir. 2014); *see also Eaton Corp. v. Appliance Valves Corp.*, 526 F. Supp. 1172, 1181 (N.D. Ind. 1981) (the mere risk of irreparable harm is insufficient).

LigTel's other allegations of harm are equally sparse and generic. LigTel's contentions that it will suffer harm to its goodwill that will inhibit its ability to contract with other ISP providers is not borne out in the record. In the nearly four years that Baicells has utilized HNI code 31198, LigTel has not had a single instance where an ISP provider questioned LigTel's business integrity. LigTel relies solely on the interference incident with Viaero[14] to demonstrate that its goodwill with other providers may be harmed and this absence of goodwill may "ultimately frustrate LigTel's ability to serve its customers." (LigTel's Pre-Hr'g Br. at 13.)  But, what this adds up to is a mere possibility of harm which "could arise," not harm that is likely to occur. As a result, LigTel has not demonstrated that absent an injunction it will suffer irreparable harm for which there is no adequate remedy at law.

### C.   Balancing Phase: Weighing of Harms and the Public Interest

In light of the absence of LigTel's showing of irreparable harm or a likelihood of success on the merits, the Court is not required to expend effort examining the balancing phase of the preliminary injunction analysis. *Kiel v. City of Kenosha,* 236 F.3d 814, 817 (7th Cir. 2000) (finding that plaintiff's failure to meet the threshold elements for obtaining preliminary injunctive relief is sufficient to end the analysis). However, because the injunctive relief sought in this case also raises serious concerns for the public, the Court further buttresses its determination that, on this basis as well, injunctive relief is not warranted.

---

[14] To the extent that LigTel seeks to rely on Sandhills as well as New Lisbon, the Court notes that these are really all one inter-related incident. The initial interference issue occurred between Viaero and Sandhills and was the result of the parties being in the same shared spectrum. As a result of that issue, LigTel itself sought out other providers, such as New Lisbon, and, in turn, pointed out the concern over the HNI code.

The Court is mindful of the unprecedented magnitude of the COVID-19 pandemic and the Court takes judicial notice of the present national (and world-wide) emergency, *see* Presidential Proclamation #9994, 85 F.R.15337, 2020 WL 1272563 (March 13, 2020) (proclaiming that the Covid-19 outbreak in the United States constitutes a national emergency under §§201 and 301 of the National Emergencies Act, 50 U.S.C. 1601, *et seq.*) Given the constantly-developing emergency, there is little point in the Court providing a detailed snapshot of its status other than to acknowledge that much of the nation is under voluntary or mandatory "stay-at-home" orders which require or encourage minimal contact between citizens in an effort to slow the spread of the virus. Restaurants, schools, universities, hotels, bars, and many retail establishments and businesses have closed. Employees are asked to work remotely and students at all educational levels have been asked to engage in online instruction. Medical professionals are encouraged to rely on tele-health appointments with patients. Under these conditions, it suffices to say that wireless internet has become critical for the public to engage in work, school, and commerce.

Baicells' customers currently consist of 544 wireless ISPs providing wireless services to rural communities. (Suppl. Harnish Decl. ¶ 9). In turn, these customers currently serve about 26,248 end users. However, "those end users include families and businesses" making the number of actual individual users relying on internet access much higher. (*Id.* ¶10.)

As part of the Plan, Baicells has articulated to its ISPs a final migration date of July 1, 2020. On that date, Baicells will shut down its old cloud core that uses HNI code 31198 and operate under a new cloud core utilizing HNI code 314-030. All 544 ISPs are required to upgrade their networks to implement use of Baicells' new HNI code 314-030 and retain network access. To date, Baicells represents that 35% of its 544 customers have upgraded as requested. Without the upgrade

to their networks by July 1, Baicell's ISP customers will be shut down from the old cloud core, in turn, terminating their end users' access to wireless internet services.

LigTel's request for a preliminary injunction asks the Court to speed up Baicells' migration process to its new HNI code by requiring it to, in turn, direct its ISPs, to upgrade before the currently set migration deadline of July 1, 2020. As part of this argument, LigTel requests the Court to order Baicells to upgrade the SIM cards of its ISPs current customers so that the new SIM cards no longer contain LigTel's HNI code. Absent this upgrade to the SIM cards, LigTel contends it will continue to be harmed by Baicells' use of its HNI code.

During oral argument, the Court inquired as to: (1) whether the migration could be expedited; and (2) what additional harm LigTel would suffer in the just over two months between now and July 1. With respect to the first inquiry, Baicells responded that it was not "impossible" but that "there's a reason that July 1st was picked." (Hr'g Tr. at 38.) "The ultimatum announcement went out March 18th. That's the do or die convert or you're cut off July 1st. And so the expectation has been set among the 544 network operators that they have that time frame to do this work." (*Id.* at 38.) Additionally, Baicells' counsel noted:

> They're doing this work during a pandemic, during a time where there's peak demand to add subscribers and to add internet service. And so, you know, it's not a great time. And it's not like just flipping a switch.
>
> For a network operator to migrate, upgrade the software and migrate from one cloud environment to the other requires a bit of work, it requires a bit of testing, it requires resolution of any bugs or issues which arise, and that requires Baicells to provide the support necessary for that to happen. . . .
>
> There's not a master switch at Baicells' headquarters that we can flip and this is all done. It is a one-on-one working with each operator to make this happen.

(*Id.*) With respect to the additional harm that LigTel might suffer, LigTel responded:

> As for the harm, there is not some additional harm, some new harm that we think will happen between now and July, but we're being harmed today. They are using

28

> our code with no basis for doing so and, frankly, without any identified defense for doing so today.
>
> And so, frankly, every day that goes on when we have this overhanging risk with the actual confusion, we think, is a bad day.

(*Id.* at 23.)

In practical terms, LigTel's request asks this Court to weigh the potential elimination of internet access to members of the public in the midst of a national emergency against what LigTel itself acknowledges as minimal or no additional harm to it. LigTel's requested relief creates numerous practical concerns. For instance, LigTel's argument that no customers need lose internet access presumes that this Court has some degree of control over whether Baicells' ISPs (all 544 of whom are non-parties in this action), in fact, comply with any directive from Baicells that it conduct an expedited upgrade to its system. The potential cost, in terms of public harm, if even a small percentage of ISPs decline to make the upgrade during this pandemic is massive.

Second, LigTel requests that the SIM cards for existing end users be immediately replaced to avoid the continued use of the HNI code 311-98. The specifics of how such a task would, or even could, be accomplished in the midst of voluntary and mandatory "stay at home" orders is not addressed. Moreover, whether these SIM cards need to be changed out at all is the subject of debate. During oral argument, the parties made abstruse arguments about the workings of SIM cards and how they do or do not broadcast an HNI code. After oral argument, LigTel submitted a Supplemental Declaration of Wentworth (ECF No. 39) intended to clarify the issue. The Declaration, while didactic in the details of SIM cards, does little to alter this Court's conclusion that the immediate replacement of the SIM cards is neither feasible nor practicable, especially in light of the Covid-19 pandemic. What is relevant and worthy of focus is the potential risk to the public if the Court were to order injunctive relief in the form LigTel seeks. That risk to the public

outweighs any benefit obtained by LigTel in expediting the migration process, especially when considered in combination with its unlikely success on the merits and failure to make a showing of irreparable harm.

## CONCLUSION

For the aforementioned reasons and on the record before it, the Court DENIES LigTel's Motion for Preliminary Injunction (ECF No. 4).

SO ORDERED on April 21, 2020.

s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT